UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                          :
BARCLAYS CAPITAL INC., MERRILL LYNCH,     :
PIERCE, FENNER & SMITH INCORPORATED,      :
AND MORGAN STANLEY & CO. INCORPORATED,    :
                                          :    06 Civ. 4908 (DLC)
                        Plaintiffs,       :
                                          :
              -v-                         :    OPINION & ORDER
                                          :    ‾‾‾‾‾‾‾‾‾‾‾‾‾
THEFLYONTHEWALL.COM,                      :
                                          :
                        Defendant.        :
                                          :
---------------------------------------- X

Appearances:

For Plaintiffs:
R. Bruce Rich
Benjamin E. Marks
Jonathan Bloom
Jackson Wagener
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

For Defendant:
Glenn F. Ostrager
Joshua S. Broitman
Dennis M. Flaherty
Roberto Gomez
Ostrager Chong Flaherty & Broitman P.C.
570 Lexington Avenue
New York, NY 10022

DENISE COTE, District Judge:

     This litigation confronts the phenomenon of the rapid and

widespread dissemination of financial services firms' equity

research recommendations through unauthorized channels of

electronic distribution.  This dissemination frequently occurs

before the firms have an opportunity to share these recommendations with their clients -- for whom the research is intended -- and to encourage the clients to trade on those recommendations. The firms contend that their recommendations are "hot news" and that the regular, systematic, and timely taking and redistribution of their recommendations constitutes misappropriation, which is a violation of the New York common law of unfair competition.

Barclays Capital Inc. ("Barclays Capital"), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), and Morgan Stanley & Co. Inc. ("Morgan Stanley") (collectively, the "Firms") have brought suit against defendant Theflyonthewall.com, Inc. ("Fly"). Fly is an internet subscription news service that aggregates and publishes research analysts' stock recommendations along with many other items of varying interest to investors. In addition to asserting hot-news misappropriation, the Firms accuse Fly of infringing the copyrights of Barclays Capital and Morgan Stanley in seventeen research reports released in February and March 2005. For the reasons described below, judgment shall be entered for the plaintiffs on both claims.

This action was originally filed on June 26, 2006 by Lehman

Brothers Inc. ("Lehman Brothers"),[1] Morgan Stanley, and Merrill Lynch[2] and assigned to the Honorable George B. Daniels. Fly answered on August 16, 2006 and asserted counterclaims for defamation, tortious interference with prospective business relations, and unfair competition under § 43(a) of the Lanham Act. Those counterclaims were dismissed on March 15, 2007. Following a lengthy period reserved for settlement negotiations, fact discovery closed on or about December 19, 2008.

The case was reassigned to this Court on June 8, 2009. The Firms and Fly each filed motions for summary judgment on May 18, 2009, which became fully submitted on August 11, 2009. Thereafter, the Firms advised that they would voluntarily waive their claims for damages to the extent that such claims would entitle any party to a jury trial. On September 3, Fly acknowledged that the parties were not entitled to a jury trial.

---

[1] In 2008, Barclays Capital acquired Lehman Brothers' North American investment banking, capital markets, and equity research businesses and became vested with all of Lehman Brothers' intellectual property interests in its preexisting equity research, and promptly re-launched Lehman Brothers' U.S. trading and research operations under the Barclays Capital name. On November 19, 2008, Barclays Capital moved to substitute itself for Lehman Brothers as a plaintiff in this action, and this motion was granted and the caption amended on March 19, 2009.

[2] On January 1, 2009, Merrill Lynch was acquired by Bank of America Corporation. Since that date, all U.S. equity reports generated by Merrill Lynch have been branded as "Banc of America Securities-Merrill Lynch" research or as "BofA Merrill Lynch" research.

The summary judgment motions were denied on November 6, 2009, and the case was set down for a bench trial.

With the parties' consent, the trial was conducted in accordance with the Court's Individual Practices.  In advance of the March 8 trial date, the direct testimony of the witnesses was presented through affidavits submitted with the joint pretrial order along with the parties' trial exhibits.  The Firms presented the affidavits of Barry Hurewitz, Chief Operating Officer of Investment Research at Morgan Stanley ("Hurewitz"); Stuart Linde, Global Head of Equity Research at Barclays Capital and former U.S. Director of Equity Research at Lehman Brothers ("Linde"); Kathleen Lynch, Chief Operating Officer for the Global Research Group at Merrill Lynch ("Lynch"); and Candace Browning, President of Global Research at Merrill Lynch ("Browning").  Fly presented affidavits from Ron Etergino, President and majority owner of Fly ("Etergino"); Kellie Berg Garfunkel, a news reporter for Fly ("Garfunkel"); Jay Mahr, a news editor for Fly ("Mahr"); and Margaret Muldoon, a marketing consultant for Fly ("Muldoon").  Of the Firms' witnesses, all four appeared at trial and were available for cross-examination.  Plaintiffs also called Etergino as an adverse witness on their case-in-chief.  Of the defendant's witnesses, Etergino, Garfunkel, and Mahr appeared at trial and were available for cross-examination.  The parties accepted

Muldoon's affidavit by stipulation.  Etergino also demonstrated the functionality of Fly's website as part of the defendant's case-in-chief.

Four pretrial motions were filed.  First, the Firms moved in limine to preclude the admission of testimony under Fed. R. Civ. P. 37(c)(1) by a third-party witness, Kevin Reynolds, on the basis that Fly had failed to make proper discovery disclosures concerning Reynolds as required by Fed. R. Civ. P. 26(a)(3)(A)(i).[3]  The parties stipulated to three of the four facts that Fly sought to elicit from Reynolds, and the motion to preclude was granted as to the fourth.  Second, Fly moved in limine to preclude certain direct testimony proffered by the Firms on the grounds that it was irrelevant, hearsay, and/or improper lay opinion testimony.  That motion was granted to the extent indicated on the record at the final pretrial conference and otherwise denied.  Finally, Fly's motion for judgment on partial findings on the hot-news misappropriation claim, and Fly's motion to preclude evidence concerning its prior lawsuit for copyright infringement and hot-news misappropriation against its competitor TradeTheNews.com ("TTN"), were each denied.

This Opinion constitutes the findings of fact and conclusions of law following the March 8-11, 2010 bench trial.

---

[3] Reynolds and his current employer, Bloomberg L.P. ("Bloomberg"), also moved successfully to quash the trial subpoena served on Reynolds.

The factual findings are principally set forth in the first section of this Opinion, but appear as well in the final section.

## FINDINGS OF FACT

I.   The Firms' Equity Research Business Model

The Firms are major financial institutions that provide wealth and asset management, securities trading and sales, corporate finance, and various investment services. Collectively, their customers include large institutional clients, foundations, corporations, businesses of every size, families, and individuals.  Among their clients of particular importance to the issues in this litigation are U.S. hedge funds, private equity firms, money managers, mutual funds, pension funds, and wealthy individual investors.  The services that the Firms offer their clients, including research reports, financial analytics, and trading tools, support clients' investing activities and are intended to assist with maximizing their returns on those investments.  One principal source of revenue for the Firms is the commissions earned when they facilitate trading on behalf of their clients.

The development and marketing of research about major publicly traded equity securities, or "equity research," is a critical component of each Firm's business model.  It is a

foundational element of the relationship between the Firms and their most significant clients.  The Firms use their equity research -- and their reputations for creating reliable and valuable advisory reports based on that research -- to attract and retain clients, to entice clients to execute trades through them, and to differentiate themselves from other financial services firms.

A.    Content of Equity Research Reports

The Firms' equity research reports may be company-specific, industry-wide, or macroeconomic in focus, and may range from a single page to hundreds of pages in length.[4]  The Firms' company-specific research reports may include projections of future stock prices, judgments about how a company will perform relative to its peers, and conclusions about whether investors should buy, sell, or hold stock in a given company.  Each Firm maintains its own rating system to indicate whether analysts believe the price of a stock is likely to increase, decrease, or

---

[4] The Securities Exchange Act of 1934, as amended by the Sarbanes-Oxley Act of 2002, defines a "research report" as "a written or electronic communication that includes an analysis of equity securities of individual companies or industries, and that provides information reasonably sufficient upon which to base an investment decision."  15 U.S.C. § 78o-6(c)(2).  See also SEC Regulation Analyst Certification ("Regulation AC"), 17 C.F.R. § 242.500 (2005).

remain relatively steady.[5]  Each of the Firms issues scores and

sometimes even hundreds of research reports in a single day.

Only a small fraction of reports, however, are "actionable" in

the sense that they are likely to spur any investor into making

an immediate trading decision.  The actionable reports are those

that upgrade or downgrade a security; begin research coverage of

a company's security (an event known as an "initiation"); or

predict a change in the security's target price.

While the actionable reports, which the parties and this

Opinion will refer to as Recommendations, are issued around the

clock, the vast majority of them are issued between midnight and

7:00 a.m.[6]  Recommendations may move the market price of a stock

significantly, particularly when a well-respected analyst makes

a strong Recommendation.  Such market movement usually happens

quickly, often within hours of the market opening following the

Recommendation's release to clients.  Thus, timely access to

---

[5] As one example, Linde testified regarding Barclays
Capital's rating system:

> Stocks are given one of three ratings: a rating of "1-
> overweight" indicates that the stock is expected to
> outperform the companies in the sector coverage
> universe over a 12-month investment horizon; a rating
> of "2-equal weight" indicates that the stock is
> expected to perform in line with the sector coverage
> universe over a 12-month investment horizon; and a
> rating of "3-underweight" indicates a below-average
> return.

[6] All times in this Opinion should be understood to refer to
Eastern Time.

Recommendations is a valuable benefit to each Firm's clients, because the Recommendations can provide them an early informational advantage.

Each Firm also produces summaries of its company-specific reports that include, in aggregated form, the actionable elements (such as the Recommendations and brief commentary) of the research reports released by the Firm overnight or early that morning.  For example, Barclays Capital provides a "Morning Meeting" flash summary and a "Before the Bell" report, each of which includes the Recommendations the Firm released that morning.

B.   Production of Equity Research Reports

Each of the Firms devotes substantial resources to the production of their equity research reports.  Each has hundreds of employees devoted full-time to the production of original equity research, and each invests hundreds of millions of dollars per year in creating the research.  For example, Merrill Lynch's Global Research department covers approximately 3,200 stocks across 48 different industries and issues approximately 40,000 equity research reports per year.  In addition, each Firm calls upon its analysts to undertake other activities as well, such as participating in conference calls, interfacing with clients, and hosting corporate access events.  The preparation

of research reports, however, is at the core of everything that the research departments at the Firms do.

The work done by the analysts to prepare equity research reports at each Firm is broadly similar.  The analysts typically specialize by following particular industries, companies, and/or countries or geographic regions.  The creation of research reports is a time-consuming endeavor.  To carry out their work, analysts gather company-specific and industry-wide financial results; visit a company's facilities; build and maintain relationships with sources of information, including salespeople, corporate representatives, traders, clients, experts, and fellow analysts; conduct surveys of customers and competitors; track industry and economic trends; assess relative stock valuations; create and update financial models; synthesize the gathered data; make quantitative projections about future earnings, cash flow, balance sheet items, and stock valuations; draw conclusions; and, finally, collaborate with team members to arrive at a formal Recommendation.  The Firms' analysts must also exercise judgment in determining when to initiate or terminate research coverage of a particular company, how often to issue new reports, and when to change the rating, target price, or other investment advice for a given security.

The Firms are widely recognized for their expertise and reputation in the field of equity research.  All three Firms

have been recognized by industry observers such as Institutional Investor for their research quality, with Lehman Brothers and its successor Barclays Capital being named the top U.S. equity research team every year from 2002 through 2009.

C.    Distribution of Equity Research Reports

Each of the Firms maintains sizable client bases that act as consumers of their research and expends substantial resources to disseminate their research to those clients.  For example, Morgan Stanley has approximately 7,000 institutional investor clients and close to 100,000 individual investors who receive regular access to its research reports.  A single sophisticated client, such as a hedge fund or mutual fund, may have many employees who receive a copy of the Firms' research reports; thus, for the 7,000 institutional accounts at Morgan Stanley, a total of 125,000 "contacts" are collectively authorized to receive research.  Thus, Hurewitz estimated at trial that approximately 225,000 separate people have full entitlement to receive research reports from Morgan Stanley.  Millions more Morgan Stanley retail clients can also gain access to its research by requesting specific reports from their Financial Advisor.  Aside from distributing their own research, the Firms are not otherwise involved in the business of reporting or distributing financial or business news.

As is explained below, each Firm has a system for determining which clients are allowed to receive the Firm's full set of research reports and Recommendations.  The Firms distribute their research reports to these "entitled clients" through several authorized channels.

First, entitled clients are granted access to password-protected proprietary internet platforms, separately maintained by each Firm, to which the research reports are posted.[7]  Second, to serve clients who wish to consolidate on one platform all of the research to which they are entitled from multiple sources, each of the Firms also licenses third-party distributors to disseminate their research.  Such licensed distributors, which vary from Firm to Firm, include Bloomberg, Thomson Reuters, TheMarkets.com ("TMC"),[8] FactSet, and Capital IQ.  For licensed

---

[7] Lehman Brothers disseminated its equity research on the "LehmanLive platform"; Barclays Capital's successor platform is known as "Barclays Capital Live."  Morgan Stanley's platform is known as "Research Link."  Merrill Lynch maintains two internal systems through which clients may receive the Firm's research reports electronically.  The first, "Research Subscribe," allows clients and Merrill Lynch trading personnel to receive the Firm's equity research via email distribution.  The second, "MLX," allows clients and trading personnel to access the research online using a username and password.  Following Bank of America's purchase of Merrill Lynch in 2009, Merrill Lynch research reports are also available through a Bank of America distribution platform similar to MLX and known as "BAS Portal."

[8] TMC is a consortium of sell-side brokers that consists of some 11 member firms.  Like Bloomberg or Thomson Reuters, it serves as a research aggregator for the distribution of Firms' content to entitled clients of the respective member firms.

distributors that also maintain their own financial news
reporting businesses, such as Bloomberg and Thomson Reuters, the
Firms require that the distributors maintain a "firewall" such
that the media arm cannot obtain information from the research
arm, although an end user may nevertheless receive both research
and media content on the same physical interface.[9]  The Firms
also insist that the licensed distributors employ systems that
ensure that a Firm's research reports are accessible only to
that Firm's entitled clients.  In recent years, the Firms have
redoubled their efforts to manage "entitlements" on these third-
party platforms so that no one can access their research through
the licensed distributors that would not already have direct
access through the Firms themselves.  At each of the Firms, once
an analyst releases a research report, it is delivered
simultaneously to all authorized distribution channels, both
internal and external, with the exception of an embargoed
research market.[10]

---

[9] For example, Bloomberg delivers the Firms' research reports
through the Bloomberg Terminal, which also can deliver to any
Terminal user Bloomberg's own newsfeed (known as Bloomberg
Market News) and any other newsfeeds to which the user has
separately subscribed.

[10] On the "embargoed market," the Firms sell their research
reports one to two weeks after their initial distribution to
customers like law firms, management consulting firms,
accounting firms, and academic institutions.  The revenues
earned from the sale of research on the embargoed market are

The Firms also personalize the distribution of their research to a targeted subset of entitled clients.  After the research reports have been distributed through the two channels described above, brokers and sales-traders at the Firms may email the research reports directly to certain entitled clients or disseminate their substance by instant message ("IM") or telephone.  The Firms also host private conference calls or "webcasts" in which their analysts discuss their research reports and Recommendations with Firm clients; access is restricted to those who have been given a call-in number or login and passcode.

This targeted and personalized outreach is at the heart of this case.  The Firms have identified a small number of clients, principally institutional clients, on which they concentrate their analyst and sales outreach efforts.  For example, roughly 200 of Morgan Stanley's thousands of institutional clients account for over two-thirds of the time and resources the Firm devotes to marketing its research.  As noted above, any one of these 200 clients may have scores of contacts entitled to receive research, each of whom plays some role in the client's investment decisions, including the choice of which brokerage firm will receive their trading order.

---

comparatively modest, amounting to only a few million dollars per year or less.

The Firms' follow-up regarding their Recommendations with this targeted subset of clients is a highly orchestrated and intensive sales effort.  Each of the Firms conducts a morning meeting at roughly 7:15 a.m., at which an analyst who has just released a significant Recommendation is given only three minutes to describe the Recommendation.  This series of analyst presentations is delivered to the Firm's sales staff and concludes by 8:00 a.m.  Armed with this new information -- as well as their existing knowledge of their clients' needs and interests -- the sales force calls, emails, and IMs clients in a sustained effort to reach their contacts at the targeted client base, recommend a trading strategy, and invite the client to place the trading order at the Firm.  Most communications are very short; for example, each telephone contact may last anywhere from 90 seconds for a voicemail to five minutes, or longer, for a conversation.  This activity is most intense from the hours of 8:00 a.m. to mid-day, but can extend over a two-day period for a particularly significant Recommendation.  The Firms act with such alacrity and intensity because they believe that every second counts for many contacts in this target client base.

Thus, equity research at the Firms is not an independent, self-sustaining business, but rather, complements each Firm's brokerage and trading operations.  Equity research reports are

the Firms' intellectual capital, and their substantial investment in producing high-quality equity research is ultimately justified only by the role that research plays in driving commission revenue.  The greater the perception of value, the more that clients are willing to pay to gain and retain access to that research by directing their trading business to the Firm.

The value of the research derives not just from its quality, however, but also from its exclusivity and timeliness. Some sophisticated clients, such as hedge funds, seek to act on the Recommendations before other investors do so.  These sophisticated clients seek an advantage over other investors by relying on the high-quality analysis underpinning the Firms' Recommendations, anticipating market movement, and making rapid trading decisions.  Such "short-horizon" investors are also the principal drivers of trading revenues for the Firms.

For other investors, with longer investment horizons, research reports retain value over hours, days, or even longer. Whatever a client's trading model, however, it is the Firms' experience that their clients are more likely to execute a trade through the Firm if they learn of the Recommendation directly from the Firm rather than from another source.  As Lynch explained at trial, a client who learns of a Recommendation from a telephone call from Merrill Lynch often will decide to

initiate a trade on the spot.  Even those clients who learn

about a Merrill Lynch recommendation through Merrill Lynch's

internet distribution platform or one of its licensed outside

vendors are expected to, and usually do, execute their trades

through the Firm.  Lynch and Browning estimated at trial that at

least 60 percent of all trades conducted in their Firm's Global

Wealth Management division are caused by Firm solicitations.

D.    Efforts to Control Access to Research

     To wring the most value from their research, the Firms have

worked hard in recent years to tighten control over who may view

their research output.  For example, the Firms limit full

research access to only those clients who meet a certain

threshold of annual revenue generation for the Firm, such as

$50,000 or even $100,000.  Clients who generate revenue below

such thresholds may be authorized to receive some research, but

not immediate and automatic access to the full universe of

research reports.  The Firms also periodically "scrub" the list

of recipients entitled to receive research based on whether or

not they have continued to direct sufficient business to the

Firms.  The Firms have communicated to their employees that the

unauthorized dissemination of their equity research or its

contents is a breach of loyalty to the Firm, undermines the

Firm's creation of revenue, and can result in discipline, including firing.

To further control the dissemination of the research, the Firms purport to forbid their clients from redistributing the Firms' research content.  For example, research reports contain standard prohibitions, such as "[t]his report or any portion hereof may not be reprinted, sold or redistributed without the written consent of [the Firm]."  Similar prohibitory warnings are placed on the Firms' distribution platforms and inserted into third-party license agreements.  Those license agreements contain explicit contractual covenants against distribution to unauthorized parties, such as one Firm's contract with Bloomberg providing that "[t]he parties hereby agree that the Research Reports may only be distributed to those Users entitled by [the Firm] to receive the Research Reports" and that "Bloomberg . . . shall not, without the consent of [the Firm], disclose or make the Research Reports available to any persons other than approved Users and those Bloomberg employees with a need to know."

The media and communications policies at each of the Firms have been tightened in recent years to ensure that disclosure of Recommendations to the press does not undermine the ability of the Firms to generate trading revenue.  At Morgan Stanley, research information is only distributed to the media on a case-

by-case, limited basis, and even then only to those reporters
who produce original content, use the Firm's research as context
for a broader story, and maintain an ongoing relationship with
the Firm's communications department.  Similarly, Merrill Lynch
only considers reporter requests to confirm stock
Recommendations after 2 p.m. or, in the case of a Recommendation
issued during the trading day, on a four-hour delayed basis, and
only then in the context of a broader story containing original
reporting and analysis.[11]

   Finally, the Firms are working to exploit recent
technological innovations in internet security in an effort to
monitor and curtail the unauthorized dissemination of their
research.  As part of its "Intellectual Content Protection
Initiative," Merrill Lynch conducts regular internet searches to
locate instances of unauthorized redistribution of its research
content.  As part of this surveillance, the Firm aims to
determine if unauthorized parties are using its private URLs to
access Firm research, and if so, the Firm then disables those
links.[12]  Certain websites and social networking platforms are

---

[11] This represents a change from Merrill Lynch's previous, more
lenient media policies, in which there was a one-hour and then a
three-hour embargo on the release of research reports to media
sources.

[12] A URL, or Uniform Resource Locator, is the technical name for
the internet address at which a particular web page or document
may be found.  For example, the URL for Fly's website is

"blacklisted" so that Merrill Lynch URLs will not function on those websites.  The Firm has also developed personalized, encrypted URLs for delivering research to clients, so that each client's usage can be individually monitored and any resulting abuse can be tracked, and the Firm has embedded vendor-specific "watermarks" into research reports so that the Firm can determine through which licensed distributor a leaked report had passed.  Morgan Stanley monitors distribution leakage through a readership screening engine, watch list, and what it calls its Client Systems Analytics Team.

E.    The Firms' Frustrations Over Lack of Control

Even though the Firms have always tried to limit the distribution of their Recommendations to entitled clients, they do not dispute that many of their Recommendations leak from authorized channels and are then posted by online aggregators or reported as financial news in the mainstream media.  This leakage became a noticeable phenomenon by 2004.  In that year, they identified Fly as one of the most systematic unauthorized publishers of their Recommendations, and by 2005, the Firms had begun to take serious steps to address the problem of unauthorized redistribution of their Recommendations and

---

http://www.theflyonthewall.com.  URLs can be devised in such a way that multiple, distinct URLs can nonetheless lead a user to the same ultimate destination.

research.  Thus, many of the systems designed to control access
to research reports and Recommendations that are described above
were implemented or tightened in the years following 2004.  In
the last five years, each of the Firms has also invested
substantial resources in studying how its research, and in
particular its Recommendations, were being redistributed and how
it could stop or impede that process.

The unauthorized redistribution of research reports and
Recommendations has had another impact on the Firms.  The Firms
have cut their analyst staff and budgets significantly in the
last five years because of their perception that equity research
is no longer driving commission revenue as forcefully or
consistently as it once had.  With clients able to review the
Firms' Recommendations and even research reports through other
sources, the research departments have been handicapped in their
ability to argue for their historical share of the Firms'
overall budgets.  Thus, with the decline in exclusivity of their
research, the resources that the Firms have devoted to research
production have declined.  For example, the number of analysts
in one Firm has been cut by 20 percent over the past five years,
and the research budget at another has been cut in half over the
past decade.  At one of the Firms, the North America research
team, which includes all research into U.S. stocks, has been
scaled back even more dramatically.  Because of these cuts, many

companies' equities are no longer being covered by the Firms' analysts.

During this same period, of course, other factors have had an impact on the financial well-being of the investment firms in general and on their research budgets in particular.  Since 2008, the world has experienced an economic cataclysm.  Discount trading platforms have proliferated, which enable investors to buy or sell securities with cut-rate commissions.  Moreover, in 2002, a joint investigation by the New York Attorney General and federal securities regulators uncovered widespread conflicts of interest among equity research analysts in major Wall Street firms.  The resulting Global Research Analyst Settlement, finalized in April 2003, required ten major investment firms -- including the plaintiff Firms -- to pay approximately $1.4 billion in disgorgement and civil penalties.[13]  In addition, based on various information unearthed by the joint investigation, dozens of class action lawsuits were filed by investors against the investment firms and litigated over the years that followed.[14]

---

[13] See U.S. Securities & Exchange Commission, Ten of Nation's Top Investment Firms Settle Enforcement Actions Involving Conflicts of Interest Between Research and Investment Banking, Release No. 2003-54 (Apr. 24, 2003), available at http://www.sec.gov/news/ press/2003-54.htm.

[14] See, e.g., In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 353-55 (2d Cir. 2010) (discussing the Global Research

While each of the above factors has undeniably had an independent impact on the health of the research departments at each Firm, the evidence at trial was compelling that the unauthorized redistribution of Recommendations has also been a major contributor to the decline in the resources that each Firm devotes to equity research.  The reason for this is not hard to fathom; the investment in research is justified by its ability to drive commission income, and when that linkage is broken, the justification is greatly diminished.

One example will suffice.  In May 2006, Merrill Lynch issued a Recommendation "contrary to the industry consensus" upgrading General Motors stock from "hold" to "buy."  The basis of this contrarian call was the Firm's prediction that far more union-affiliated workers would accept the company's offer to buy out their contracts than was previously expected by most market observers.  General Motors stock price rose approximately 30 percent following the release of Merrill Lynch's research report, and clients who traded promptly on that information earned a sizable return.  Fly, however, had posted the upgrade on its site within minutes after Merrill Lynch released the Recommendation to its clients, and thus, before the Firm's sales

Analyst Settlement and the business practices that had been subject to investigation); Shah v. Meeker, 435 F.3d 244, 245-47 (2d Cir. 2006) (same); Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 164-67 (2d Cir. 2005) (same).

professionals could reach their clients to inform them of the Recommendation.

It bears noting that it does not matter to the Firms whether the unauthorized distribution is through a small internet company like Fly or through media giants like Bloomberg, Thomson Reuters, or Dow Jones.  The damage is caused not by the identity of the publisher, but by the timely and systematic unauthorized redistribution of the Firms' Recommendations, whatever the medium.  To that end, through conference calls and face-to-face meetings with mainstream media, the Firms have objected to the systematic publication of their Recommendations.  At least one mainstream publisher of financial news has represented that it is watching this litigation against Fly closely and will adjust its practices based on its evaluation of the outcome of this litigation.  The Firms have also sent cease-and-desist letters to several of Fly's competitors in the online newsfeed niche market.

## II.  Theflyonthewall.com

Fly is a New Jersey corporation that, since 1998, has been engaged in the business of collecting and publishing financial news, rumors, and other information flowing from Wall Street via

its online subscription newsfeed, www.theflyonthewall.com.[15]  Fly
describes itself as a "single source internet subscription news
service . . . reporting relevant, market-moving financial news
and information," including "the most comprehensive database of
analyst trading calls, events, and syndicate information on the
web."  Emphasizing the timeliness of its reporting, it asserts
that, as the "fastest news feed on the web," it delivers to its
customers "actionable, equity news in a concise & timely
manner."  In the words of Fly's website, "[o]ur quick to the
point news is a valuable resource for any investment decision."

     In particular, Fly emphasizes its quick and comprehensive
access to Recommendations made by Wall Street research analysts.
It states that its newsfeed allows investors to "keep track of
the latest Upgrade/Downgrade," and is a "one-stop solution for
accessing analyst comments, directly sourced in a real time
basis."  As Fly advertises, "Theflyonthewall.com is designed to
bridge the gap between Wall Street's big players 'in the know'
and those who want into their club."  Similarly, Fly asserts
that "[h]aving a membership with the Fly is like having a seat
at Wall Street's best houses and learning what they know when
they know it."  It brags that it posts "breaking analyst
comments as they are being disseminated by Wall Street trading

---

[15] Fly maintains offices in Summit, New Jersey; Queens, New York;
and Argentina.

desks," "consistently beating the news wires."  Indeed, its very name is intended to convey that it allows its subscribers to be a "fly on the wall" inside the investment firms' research departments.[16]

Fly's website contains an explicit disclaimer advising users that Fly staff are not brokers, dealers, or registered investment advisors.  Nevertheless, Fly's marketing materials emphasize that its service is intended to assist investors.  In Fly's words, by "[c]ombining industry experience, market acumen and extensive industry contacts, thelfyonthewall.com [sic] helps investors to make better informed investment decisions."

A.    Fly's Newsfeed

The cornerstone of Fly's business is its online newsfeed, which is updated continuously every day between 5:00 a.m. and 7:00 p.m.  The newsfeed, which Etergino demonstrated at trial, presents a constant stream of "headlines" -- on average, over 600 per day -- in ten different categories.  These categories include: "Hot Stocks," "Rumors,"  "Recommendations,"

---

[16] Etergino repeatedly tried to distance himself at trial from his company's marketing materials, describing their statements as "exaggerated" and "marketing fluff."  Etergino did not deny, however, that Fly has held itself out to investors as the fastest, most comprehensive aggregator of analyst Recommendations on the internet.  His company's internal training documents for its staff also contain substantially similar descriptions of Fly's goals and methodology.

"Conference/Events," "Syndicate,"[17] "Options," "General News,"
"Periodicals," "Technical Analysis,"[18] and "Earnings."  Fly does
not conduct its own equity research or include any original
research in its newsfeed.

The headlines in one of these categories,
"Recommendations," are the basis of this litigation.  It is to
this category that Fly posts the Recommendations by sixty-five
investment firms' research analysts, including the three
plaintiff Firms.  A typical Fly headline from 2009 reflecting a
Recommendation by one of the Firms is "EQIX: Equinox initiated
with a Buy at BofA/Merrill.  Target $110."  On occasion, the
headline is accompanied by a brief summary of the research
report's reasoning, but with the commencement of this lawsuit
Fly has generally not included such summaries for the
plaintiffs' Recommendations.  Etergino estimated at trial that
approximately 80 percent of Fly's Recommendation headlines are
posted before the 9:30 a.m. market opening each day.  Fly has
posted more than two dozen Morgan Stanley Recommendations, and
up to ten Recommendations for both Merrill Lynch and Barclays
Capital, in a single day before the opening of the market.

---

[17] The "Syndicate" category reports headlines about deals such as
IPOs, spot secondaries, and block trades, which are assembled by
groups of financial institutions.

[18] The "Technical Analysis" category contains headlines
concerning broad-based macro- or microeconomic information and
its likely effect on future corporate performance.

Fly has devised a software program that permits it to compose the headline quickly by tabbing through a few categories of information.  For instance, it has a drop-down menu that permits it to indicate an upgrade or downgrade through a single keystroke.  Another tabbed menu lists every investment firm covered by Fly and is automatically linked to each firm's recommendation system, so that the individual firm's evaluative descriptor can be quickly plugged into the headline.  When Etergino makes an error in reporting a Recommendation, which he contends is rare, he blames it on a keystroke entry error and not on his newsgathering.

Within the "Conference/Events" category, Fly frequently posts call-in numbers and passcodes for conferences hosted by equity analysts at various Wall Street firms.  Fly posted conference call-in numbers and passcodes at the Firms until 2008.  The Firms never authorized Fly to post their Recommendations or these call-in numbers and passcodes.  At trial, Etergino asserted that any posting of the Firms' conference calls after 2006 was inadvertent.

The user may filter information from the entire Fly newsfeed by selecting one or more categories of headlines.  The "Recommendations" category and several other categories are also searchable, sortable, and viewable in different formats.  Users may establish a "portfolio" of up to 150 different stocks

through which they can automatically receive email, pop-up, or
audio alerts whenever Fly posts content relevant to those
stocks.  Fly also provides an audio feed of headlines streamed
through the internet, which it calls "FlyRadio."  The audio
feed, also known as a "squawk box," runs silently in the
background but is audible when there is news or information to
be heard.

While Fly's initial growth can be attributed to its
extensive and timely publishing of Recommendations by investment
and brokerage firms, over time it has diversified the kind of
information that it reports through headlines.  Thus, Fly
represents that while headlines about the three Firms'
Recommendations accounted for roughly 7 percent of its overall
newsfeed in 2005, as of 2009, only about 2.5 percent of Fly's
total content consisted of the Firms' Recommendations.

Like the Firms, Fly disseminates its content both directly
and through licensed distributors.  Fly currently distributes
its content to approximately 3,300 direct subscribers on its
website and to another 2,000 subscribers who access its content
through Fly's licensed financial content partners, such as
Bloomberg, Thomson Reuters, and others, including AOL, NASDAQ,
Acquire Media, and Wall Street Source.[19]  Fly also distributes

---

[19] Fly offers its newsfeed through the Bloomberg Terminal
pursuant to a Third Party Contributor Agreement dated August 7,

its newsfeed to eSignal, a trading platform, and to NewsWare, owned by the Track Data Corporation, which maintains its own broker/dealer and offers a service called My Track that combines live data streams with a brokerage platform. Additionally, at least of one Fly's former distribution partners, Cyber Trader, maintained an online discount brokerage platform and was associated with the online brokerage firm, Charles Schwab.[20]

Fly's subscribers include individual investors, institutional investors, retail investors, brokers, and day traders. Subscriptions to Fly's website may be customized based on three content packages -- "news," "events," and "syndicate" -- and can be purchased on either a monthly or a yearly basis. Etergino estimated at trial that two-thirds of Fly's customers subscribe to all three of Fly's content packages, while the remaining one-third subscribe only to the "news" package, which includes the "Recommendations" category. The price to subscribe

---

2001. Under this agreement, Fly is provided with several Bloomberg Terminals with access to Bloomberg Market News; Fly pays Bloomberg an annual fee; and Fly receives a percentage of the additional subscription fee that Bloomberg charges Terminal users for access to Fly's newsfeed. Approximately 700 Fly subscribers access Fly through the Bloomberg Terminal. Fly also offers its newsfeed through Thomson Reuters, with whom it splits the additional subscription fees. Fly's relationship with AOL consists of Fly sending the latter three stories per day, including "recommendation wrap-ups," in exchange for a nominal payment per story.

[20] The content that Fly licensed to Cyber Trader was its "Recommendations" feed, which at trial Etergino stated also included "Hot Stocks" and "General News."

to all three packages is $50 per month or $480 per year, while the price to subscribe to just one package is $25 per month or $240 per year.

Fly has also established an RSS (really simple syndication) feed that distributes Fly's newsfeed headlines over various RSS readers, including Google, AOL, Yahoo!, and SkyGrid.[21]  This RSS feed contains all of Fly's headlines, with one exception: Fly's RSS feed does not contain any headlines reporting the three plaintiffs' Recommendations.  While the RSS feed is available free of charge and does not earn any revenue for Fly, it is Etergino's hope that readers of the RSS feed will decide to subscribe to Fly's website in order to benefit from somewhat quicker and less cumbersome access to the newsfeed.

Fly's staff has grown from five employees in 2002 to a current staff of 28 full- and part-time employees. Approximately half of its staff is involved in production of the live newsfeed, while a smaller number work on the other arms of the business.  At one time, six Fly employees worked on the "Recommendations" category, but only two or three employees are now involved.

---

[21] RSS is a service that automatically syndicates content from a publisher's website in real time, and in a format that enables users to aggregate feeds from many different websites into an RSS reader, where the feeds can all be reviewed in one place.

B.    The Evolution in Fly's Practices

While Fly continues to publish many of the Firms'
Recommendations, its sources for those Recommendations have
changed because of this litigation.  Up until 2005, Fly relied
almost exclusively on employees at the Firms who emailed the
research reports to Fly soon after they were released.  The
employees were not authorized by the Firms to provide reports to
Fly, but did so nonetheless.  Fly staff would peruse the reports
for Recommendations, select those it wished to publish, and then
type each Recommendation as a headline into its own newsfeed,
sometimes accompanied by an extended passage lifted essentially
verbatim from the report explaining the basis for the
Recommendation.[22]

---

[22] The following example is an excerpt from Lehman Brothers'
March 1, 2005 machinery industry update report:

> A number of potential positive events in March should
> allow recent rally in machinery sector to continue.
> Namely, moving forward on an agreement for a highway
> bill (expected to be approved by May '05) which could
> come in near $284 billion (up from $218 billion on
> last bill) and possibly move to the president ahead of
> schedule.  Additionally, ConExpo (construction
> industry conference) will take place from March 15th
> to the 19th and should provide a lot of comfort that
> commercial construction spending is poised to recover
> over the next few quarters.
> . . . .
> We continue to recommend purchase of IR, CAT, PH, ETN,
> ITW and JOYG.

Fly rendered its own "abstract" of Lehman's report on March 1,
2005 as follows:

As a result of this litigation, Fly represents that it has substantially changed its process for gathering and communicating Recommendations.  Some investment firms, such as Wells Fargo, continue to send their research reports to Fly directly so that the Recommendations therein can be reported in Fly's newsfeed.  When it comes to the plaintiff Firms, however, Etergino professes that he no longer feels free to look at the research reports, even if someone should send them to him.  Instead, Etergino asserted at trial that he is usually the only employee who posts the Firms' Recommendations, and by 2009, he was engaging in a ritualistic and labor-intensive process of "confirming" each Firm's Recommendations from at least two and sometimes three independent sources before publishing them, still typically before the market opening.

---

Potential positive events moving forward on an agreement for a highway bill (expected to be approved by May '05) which could come in near $284 billion (up from $218 billion on last bill) and possibly move to the president ahead of schedule.  Additionally, ConExpo (construction industry conference) will take place from March 15th to the 19th and should provide a lot of comfort that commercial construction spending is poised to recover over the next few quarters.  We continue to recommend purchase of IR, CAT, PH, ETN, ITW and JOYG.

According to Etergino, he checks first to see what Recommendations have been reported on Bloomberg Market News.[23] Then he checks Dow Jones, Thomson Reuters, and Fly's competitors such as TTN, StreetAccount.com, and Briefing.com. Next, he visits chat rooms to which he has been invited to participate by the moderator.[24] The chat rooms may have a few hundred participants; depending on the software program, the chat room occupants may not know the identities of the others present in the room. Etergino also receives "blast IMs" through the Bloomberg, Thomson Reuters, or IMTrader messaging services that may go to dozens or hundreds of individuals. Finally, Etergino exchanges IMs, emails, and more rarely telephone calls with individual traders at hedge funds, money managers, and other contacts on Wall Street. He has no explicit agreement with any of these sources of information that he will keep their identity confidential, but contends that there is an implied understanding among marketplace participants not to divulge sources' names. This understanding appears to be based on

---

[23] While Fly may have been one of the pioneers of the practice of systematically reporting research analysts' Recommendations, it now faces stiff competition in that field, including from major news companies such as Bloomberg, Dow Jones, and Thomson Reuters. Indeed, Bloomberg recently hired away Fly's chief operating officer in order to better compete in posting "hot news" and analysts' Recommendations.

[24] Etergino has only met one of the chat room moderators in person.

little more than the mutual self-interest in having an edge over the competition with respect to learning about time-sensitive market information.

Fly believes that if it can show that the Firms' Recommendations are already "public" -- meaning, apparently, available from non-Firm sources -- then it is free to republish them.  The documentation proffered by Fly to show its actual source of any particular Recommendation is limited, however, to contemporaneous printouts of Bloomberg Market News feeds and printouts of various word processing documents containing copied-and-pasted text from IMs, chat rooms, subscription newsfeeds, and other internet sources.

As of today, there is a crowded marketplace with small internet companies and major news organizations reporting the Firms' Recommendations before and after the market opens.  The other financial news organizations that provide services similar to that of Fly, and whom Fly regards as its competitors, include Briefing.com, StreetAccount.com, TTN, StreetInsider.com, TheStreet.com, Midnight Trader, and Jagnotes.com.

### III.  The Firms Warn and Then Sue Fly

In about 2004, each of the Firms became aware of Fly and concluded that its control over the distribution of its research had been compromised.  On March 3, 2005, Merrill Lynch wrote to

Fly demanding that it stop its unauthorized "dissemination of information created by . . . Merrill Lynch, including the distribution of products and services referencing Merrill Lynch's investment ratings, advice, or views via theflyonthewall.com." After receiving no response, the Firm sent a second demand letter on April 21, 2005.

On April 13, 2005, counsel for several other investment firms, including Lehman Brothers and Morgan Stanley, sent Fly a cease-and-desist letter accusing Fly of copyright infringement and hot-news misappropriation relating to Fly's publication of those firms' Recommendations in February and March 2005. The letter accused Fly of "free-riding on the Firms' efforts to formulate and disseminate timely market information to their clients," which it characterized as "misappropriation of time-sensitive information" and "the essence of unfair competition."

Counsel for Fly responded to those two letters through its own letters of April 22 and May 5, 2005. The responsive letters represented that Fly "has undertaken a review of its reporting practices" and has "adopted a new format for reporting market information on its website . . . [i]n order to avoid any question concerning conflict with your clients' copyrighted research materials." The letter assured the Firms that Fly would "take all necessary steps to avoid any infringement of the [Research] Reports."

As of June 2006, Fly was still posting headlines of the Firms' Recommendations more than an hour before the opening of the market, often before any other media outlet did so, lifting them from research reports sent to Fly from sources inside the Firms.[25]  The Firms sued Fly on June 26, 2006, for copyright infringement and misappropriation.  They did so based on their conclusion that Fly's misappropriation of their Recommendations was the most systematic and egregious of any of the unauthorized redistributors active in the market at that time.

Pursuant to a confidentiality agreement, Fly eventually provided documentation to the Firms showing that its sources for its headlines about their Recommendations often came from inside the Firms.  The Firms promptly shut down this channel of communication between their analysts and brokers and Fly.

IV.  Fly's Lawsuit Against TTN

In October 2007 -- while settlement talks in this action were ongoing -- Fly sued one of its competitors, TTN, alleging

---

[25] At trial, Etergino denied that Fly was still using research reports sent to him by sources within the Firms to create those headlines, but his counsel's letter of February 1, 2007 identifies contacts within Lehman Brothers and Morgan Stanley as the sources of the June 2006 information.  Ultimately, as the trial revealed, few if any of the material facts are in dispute. It should be observed, however, that Etergino was not a reliable reporter of facts.  He frequently contradicted himself.  His unreliability appeared attributable to both his lack of attention and care in making statements, which tended to be rushed, and his motive to escape liability.

the same claims of copyright infringement and hot-news misappropriation that the Firms had lodged against Fly.[26]  The dispute between the two internet news organizations began in 2004, when Fly's counsel advised TTN that it was misappropriating Fly's valuable, time-sensitive, proprietary information by broadcasting content from Fly's newsfeed on its own website within seconds of the content being posted.

In Fly's complaint against TTN, Fly cited 14 instances of alleged copyright infringement and 22 instances of alleged misappropriation between May and October 2007.  In several of these news items, Fly had made an error in its posted headline that was then repeated by TTN within minutes.  The lawsuit was settled on April 28, 2008 with a monetary payment by TTN to Fly and an order enjoining TTN from knowingly or indirectly gaining access to "non-public news information" reported on Fly's newsfeed.

---

[26] Fly's complaint in its suit against TTN also heavily borrowed language, structure, and argument from the complaint in this action.

CONCLUSIONS OF LAW

     The Firms have brought two claims against Fly.  As for the
first claim, Fly does not dispute that it engaged in copyright
infringement and that an injunction may issue, but contests the
imposition of attorney's fees and prejudgment interest.  As for
the second, Fly contests that it is liable for hot-news
misappropriation.

I.    Copyright Infringement

A.    Liability

     The first cause of action, brought by Morgan Stanley and
Barclays Capital (the "Copyright Plaintiffs"), is for copyright
infringement.  "[T]o prevail on a claim of copyright
infringement, a plaintiff must show both ownership of a valid
copyright and copying."  Davis v. Blige, 505 F.3d 90, 99 (2d
Cir. 2007) (citation omitted).  In order to prevail on an
infringement claim premised on unlawful copying, "the plaintiff
must first show that his work was actually copied," and "second,
he must establish substantial similarity or that the copying
amounts to an improper or unlawful appropriation."  Tufenkian
Import/Export Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d
127, 131 (2d Cir. 2003) (citation omitted).

     The Copyright Plaintiffs have provided seventeen examples
between February 14 and March 2, 2005, of Fly's direct, verbatim

copying of key excerpts from their research reports and re-publication of those excerpts on Fly's newsfeed.  Eight of these reports were published by Morgan Stanley and nine by Lehman Brothers.  For each of the seventeen reports, the Copyright Plaintiffs have proffered registration certificates.

In its defense, Fly asserted that its copying was a fair use of the Copyright Plaintiffs' reports under 17 U.S.C. § 107, and Fly maintained this defense through summary judgment.  Fly no longer disputes, however, that it infringed the copyrights in these seventeen reports.  As such, judgment shall be entered for the Copyright Plaintiffs on their claims of copyright infringement.

## B.    Remedies

The Copyright Plaintiffs seek a permanent injunction, minimum statutory damages, prejudgment interest, and attorney's fees.  Fly does not dispute plaintiffs' entitlement to a permanent injunction, although plaintiffs and Fly could not reach agreement on the terms of that injunction.  Fly likewise does not dispute plaintiffs' entitlement to minimum statutory damages of $750 per infringed report.

### 1.    Statutory Damages

Under the Copyright Act, 17 U.S.C. § 504(a), a plaintiff may elect to pursue either "the copyright owner's actual damages

and any additional profits of the infringer" under § 504(b) or "statutory damages" as calculated by § 504(c). As a general principle, "the total number of awards of statutory damages that a plaintiff may recover in any given action depends on the number of works that are infringed and the number of individually liable infringers." WB Music Corp. v. RTV Commc'n Group, Inc., 445 F.3d 538, 540 (2d Cir. 2006) (citation omitted).

Plaintiffs have elected to pursue statutory damages and have voluntarily limited their claim to the statutory minimum damages as set out in 17 U.S.C. § 504(c)(1).[27] Because Fly does not contest its liability for minimum statutory damages, Barclays Capital is entitled to $6,750 for its nine infringed reports and Morgan Stanley is entitled to $6,000 for its eight infringed reports.

2.    Prejudgment Interest

The Copyright Plaintiffs seek prejudgment interest on their statutory damage awards. "The essential rationale for awarding

---

[27] 17 U.S.C. § 504(c)(1) provides, in pertinent part:

> [T]he copyright owner may elect, at any time before final judgment is rendered, to recover . . . an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually . . . in a sum of not less than $750 or more than $30,000 as the court considers just."

prejudgment interest is to ensure that an injured party is fully compensated for its loss." City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 195 (1995). "By compensating for the loss of use of money due as damages from the time the claim accrues until judgment is entered, an award of prejudgment interest helps achieve the goal of restoring a party to the condition it enjoyed before the injury occurred." Id. at 196 (citation omitted).

Unlike the Patent Act, which contemplates an award of interest for victorious plaintiffs in patent infringement actions, see 35 U.S.C. § 284(a), the Copyright Act neither authorizes nor forbids prejudgment interest on an award of statutory damages. The Second Circuit has not yet spoken on this issue. See In Design v. K-Mart Apparel Corp., 13 F.3d 559, 569 (2d Cir. 1994) ("Whether an award of prejudgment interest is or is not permissible under the current Copyright Act, which neither expressly allows nor prohibits such award, remains unresolved in this Circuit."). Nevertheless, several other Courts of Appeal, as well as many courts of this District, have concluded that prejudgment interest may be awarded under the Copyright Act for both actual and statutory damage awards in the court's discretion. See Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 718 (9th Cir. 2004); McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 572-73 (7th Cir. 2003); Kleier

Adver., Inc. v. Premier Pontiac, Inc., 921 F.2d 1036, 1040-41
(10th Cir. 1990); TVT Records v. Island Def Jam Music Group, 279
F. Supp. 2d 366, 409-12 (S.D.N.Y. 2003), rev'd on other grounds,
412 F.3d 82 (2d Cir. 2005); Broadcast Music, Inc. v. R Bar of
Manhattan, Inc., 919 F. Supp. 656, 661 (S.D.N.Y. 1996); Bourne
Co. v. Walt Disney Co., No. 91 Civ 344 (LLS), 1994 WL 263482, at
*3 (S.D.N.Y. June 10, 1994), aff'd, 68 F.3d 621 (2d Cir. 1995).
In the exercise of its discretion, the Court awards prejudgment
interest from the date of publication to entry of judgment.  See
Broadcast Music, Inc., 919 F. Supp. at 662 n.2 (awarding
interest from the date of the copyright infringement occurred);
Bourne Co., 1994 WL 263482, at *3 (same).

        3.   Attorney's Fees

     Under the Copyright Act, "the court in its discretion may
allow the recovery of full costs by or against any party . . .
[and] may also award a reasonable attorney's fee."  17 U.S.C. §
505.  "Attorneys' fees are available to prevailing parties under
§ 505 of the Copyright Act but are not automatic."  Medforms,
Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 117 (2d
Cir. 2002).  "While 'there is no precise rule or formula for
making these determinations, equitable discretion should be
exercised.'"  Id. (quoting Fogerty v. Fantasy, Inc., 510 U.S.
517, 534 (1994)).  The court's considerations should include

"'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'"  Crescent Publ'g Group, Inc. v. Playboy Enters., Inc., 246 F.3d 142, 147 (2d Cir. 2001) (quoting Fogerty, 510 U.S. at 534 n.19).  "Such factors may be used so long as they are faithful to the purposes of the Copyright Act."  Id. (citation omitted).

The legal and factual components of defendant's conduct during the litigation of this case, as well as considerations of general deterrence, counsel strongly in favor of an award of attorney's fees.  Although Fly stopped the wholesale copying of the plaintiffs' research reports after it received the cease-and-desist letters in 2005, and ultimately conceded liability for the copyright violations at trial, Fly continued to dispute this liability for over three years following the filing of this action, including through summary judgment.[28]  Fly's asserted

---

[28] Fly suggests that there must have been some merit to its arguments opposing summary judgment on the copyright claim since the Court denied the Firms' motion for summary judgment.  Since it was evident that disputed issues of fact prevented an award of summary judgment on the Copyright Plaintiffs' request for attorney's fees as well as on the misappropriation claim, the Court did not issue any detailed examination of the competing summary judgment motions, but simply denied them and set the matter down for trial.  Pretrial Scheduling Order, Dkt. No. 87 (Nov. 6, 2009).  It would be a mistake to read the November 6, 2009 Order as a judgment about the reasonableness of Fly's proffered defenses to the copyright claim.

affirmative defenses included fair use, a defense that was rejected decades ago in Wainwright Securities, Inc. v. Wall Street Transcript Corp., 558 F.2d 91 (2d Cir. 1977) ("Wainwright"), a case wherein the defendant had infringed plaintiffs' copyrights in equity research reports broadly similar to those produced by the Firms. In Wainwright, as in this case, the defendant "appropriated almost verbatim the most creative and original aspects of the reports, the financial analyses and predictions, which represent a substantial investment of time, money and labor." Id. at 96; see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 71-72 (2d Cir. 1999) ("Nikkei"). Fly's filing of a copyright infringement lawsuit against TTN in 2007 -- for copying that was far less extensive than that done by Fly -- belies any assertion of good faith by Fly. Although Fly ceased its practice of verbatim copying in 2005, Fly's litigation position was nevertheless objectively unreasonable under Fogerty.

In opposing an award of attorney's fees, Fly principally relies upon the disparity in resources between the Copyright Plaintiffs and Fly. In recognition of this economic disparity, the Copyright Plaintiffs are awarded attorney's fees with respect to that portion of the litigation expenses that directly and predominately concerned the Copyright Plaintiffs' prosecution of their copyright infringement claim. A separate

scheduling order addressed to that fee application accompanies this Opinion.  Once the amount of fees that meets this test is determined, the Court will consider whether a further reduction is warranted based on Fly's financial condition.

    4.    Permanent Injunction

    Finally, the Copyright Plaintiffs seek a permanent injunction.  The Court adopts, with minor revisions, the injunction proposed by the Copyright Plaintiffs, which restrains Fly from further infringement of "any portion of the copyrighted elements of any research reports" generated by Barclays Capital or Barclays Capital.[29]


                II.  Hot-News Misappropriation

    The Firms have sued Fly for misappropriation of the time-sensitive Recommendations contained in their equity research reports.  The parties agree that this cause of action is properly defined as one for "hot-news misappropriation."  Before addressing this claim, some background to this doctrine of misappropriation is warranted.

---

[29] Fly has largely agreed to the terms of the Copyright Plaintiffs' proposed injunction.

A.    Legal Context

The modern cause of action for misappropriation has its origin in <u>International News Service v. Associated Press</u>, 248 U.S. 215 (1918) ("<u>INS</u>"), a case decided by the Supreme Court under federal common law that found that hot news is protectible as "quasi-property."  The Associated Press ("AP") engaged in reporting in Europe during World War I at great expense and distributed the news to its member newspapers on the East Coast of the United States for dissemination to the public. <u>Associated Press v. Int'l News Serv.</u>, 240 F. 983, 986-87 (S.D.N.Y. 1917).  The defendant, International News Service ("INS"), obtained the news from the AP by, among other means, copying AP's stories from bulletin boards and early editions of newspapers printed by AP's eastern affiliates.  INS then transmitted those stories to the West Coast, where it sold the paraphrased news stories as its own.  The district court declined to enjoin this means of copying stories, but the Court of Appeals reversed and granted AP a permanent injunction. Affirming the Court of Appeals, the Supreme Court located the tort of misappropriation within unfair competition law.  Justice Pitney wrote for the Court:

> The fault in the reasoning [of defendant] lies in
> applying as a test the right of the complainant as
> against the public, instead of considering the rights
> of complainant and defendant, competitors in business,

as between themselves.  The right of the purchaser of
a single newspaper to spread knowledge of its contents
gratuitously, for any legitimate purpose not
unreasonably interfering with complainant's right to
make merchandise of it, may be admitted; but to
transmit that news for commercial use, in competition
with complainant -- which is what defendant has done
and seeks to justify -- is a very different matter.
In doing this defendant, by its very act, admits that
it is taking material that has been acquired by
complainant as the result of organization and the
expenditure of labor, skill, and money, and which is
salable by complainant for money, and that defendant
in appropriating it and selling it as its own is
endeavoring to reap where it has not sown, and by
disposing of it to newspapers that are competitors of
complainant's members is appropriating to itself the
harvest of those who have sown.  Stripped of all
disguises, the process amounts to an unauthorized
interference with the normal operation of
complainant's legitimate business precisely at the
point where the profit is to be reaped, in order to
divert a material portion of the profit from those who
have earned it to those who have not; with special
advantage to defendant in the competition because of
the fact that it is not burdened with any part of the
expense of gathering the news.  The transaction speaks
for itself and a court of equity ought not to hesitate
long in characterizing it as unfair competition in
business.

INS, 248 U.S. at 239-40.

     A fair reading of this passage suggests that the Court's

decision was strongly influenced by several policy ideals: a

"sweat-of-the-brow" or "labor" theory of property; norms of

commercial morality and fair dealing; and a utilitarian desire

to preserve incentives to produce socially useful services.

Thus, in INS, the misappropriation doctrine was developed to

protect costly efforts to gather commercially valuable, time-

sensitive information that would otherwise be unprotected by law. Justice Brandeis, voicing his displeasure with the result reached by the majority, noted in dissent that "[t]he general rule of law is, that the noblest of human productions -- knowledge, truths ascertained, conceptions, and ideas -- become, after voluntary communication to others, free as the air to common use." Id. at 250 (Brandeis, J., dissenting).[30]

After INS, the Second Circuit reacted with hostility to the newly created tort. Judge Learned Hand wrote in Cheney Bros. v. Doris Silk Corp., 35 F.2d 279 (2d Cir. 1929), that INS was not "meant to lay down a general doctrine" and that the case instead applied to "no more . . . than situations substantially similar to those then at bar." Id. at 280; see also R.C.A. Mfg. Co. v. Whiteman, 114 F.2d 86, 90 (2d Cir. 1940) (INS does not prevent competitors from "ever appropriating the results of [others'] industry, skill, and expense"); G. Ricordi & Co. v. Haendler, 194 F.2d 914, 916 (2d Cir. 1952) (INS to be "strictly confined" to its facts).

---

[30] To be sure, Brandeis regarded INS's conduct as "inconsistent with a finer sense of propriety," INS, 248 U.S. at 257, and even acknowledged that "the propriety of some remedy appears to be clear." Id. at 267. Nevertheless, Brandeis asserted that "[c]ourts are ill-equipped to make the investigations which should precede a determination of the limitations which should be set upon any property right in news," and suggested that the solution should instead come from Congress. Id.

The force of <u>INS</u> as formal precedent was vitiated when most federal common law was abrogated by <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938).  Nevertheless, <u>INS</u> was adopted into state common law by several states, including most enthusiastically in New York.  See, e.g., <u>Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.</u>, 101 N.Y.S.2d 483, 491 (Sup. Ct. 1950), <u>aff'd</u>, 107 N.Y.S.2d 795 (1st Dep't 1951); <u>Bond Buyer v. Dealers Digest Publ'g Co.</u>, 267 N.Y.S.2d 944, 945 (1st Dep't 1966) ("It is now no longer subject to question that there is a property in the gathering of news which may not be pirated.").  Eventually, the Second Circuit itself reversed course, ruling (over Judge Learned Hand's dissent) that the misappropriation tort was not preempted by the 1909 Copyright Act.  <u>Capitol Records, Inc. v. Mercury Records Corp.</u>, 221 F.2d 657, 663 (2d Cir. 1955).  New York courts continue to recognize a broad tort of misappropriation to this day as part of unfair competition law. See <u>ITC Ltd. v. Punchgini, Inc.</u>, 9 N.Y.3d 467, 476, 478 (2007) ("We have long recognized two theories of common-law unfair competition: palming off and misappropriation. . . . [A]n unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." (citation omitted)).

The effect of federal preemption doctrines on the law of misappropriation nonetheless long remained unsettled.  In 1964, the Supreme Court launched "Sears-Compco" preemption by ruling that Illinois state unfair competition law was preempted by federal patent law.  Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225 (1964); Compco Co. v. Day-Brite Lighting, Inc., 376 U.S. 234 (1964).  A decade later, the Supreme Court reversed course.  See Goldstein v. California, 412 U.S. 546, 571 (1973) (state misappropriation statute, as applied to unauthorized duplication of sound recordings, not preempted by Copyright Act).[31]  Then, the 1976 Copyright Act codified the judicial decisions on preemption and added a new provision, § 301, that explicitly preempts all state causes of action that protect any right equivalent to any of the exclusive rights protected by the Copyright Act, including copying and distribution. Nevertheless, some of the legislative history of the Copyright Act suggested that the Act did not intend to preempt all forms of state-law misappropriation, and in particular, did not intend to preempt the misappropriation of time-sensitive "hot news." The House Report stated:

---

[31] A detailed description of judicial developments between INS and the 1976 Copyright Act is contained in Howard B. Abrams, Copyright, Misappropriation, and Preemption: Constitutional and Statutory Limits of State Law Protection, 1983 Sup. Ct. Rev. 509 (1983).

> "Misappropriation" is not necessarily synonymous with
> copyright infringement, and thus a cause of action
> labeled as "misappropriation" is not preempted if it
> is in fact based neither on a right within the general
> scope of copyright as specified in section 106 nor on
> a right equivalent thereto.  For example, state law
> should have the flexibility to afford a remedy (under
> tradition principles of equity) against a consistent
> pattern of unauthorized appropriation by a competitor
> of the facts . . . . constituting "hot" news, whether
> in the traditional mold of [INS] or in the newer form
> of data updates from scientific, business, or
> financial data bases.

H. Rep. No. 94-1476 at 132 (1976), reprinted in 1976

U.S.C.C.A.N. 5659, 5665.  This legislative history has been

relied upon regularly by courts, and courts of this and other

Circuits continue to recognize the validity of the hot-news

misappropriation tort.  See, e.g., Fin. Info., Inc. v. Moody's

Investors Serv., Inc., 808 F.2d 204, 209 (2d Cir. 1986) ("FII")

("The 'hot' news doctrine is concerned with the copying and

publication of information gathered by another before he has

been able to utilize his competitive edge.").[32]

The 1990s represented another period of flux for the hot-

news misappropriation theory.  The 1991 decision of the Supreme

---

[32] One interesting case of this period that did not concern
misappropriation, but with facts similar to the instant case, is
Wainwright, 558 F.2d 91.  In holding a publisher liable for
infringing a securities broker's copyrighted research reports,
the Wainwright court found it relevant not only that the
defendant had copied abstracts, but that the defendant's mode of
competition resembled undesirable "chiseling for personal
profit," noting that "the appellants' use of the Wainwright
reports was blatantly self-serving, with the obvious intent, if
not the effect, of fulfilling the demand for the original work."
Wainwright, 558 F.2d at 96-97.

Court in Feist recognized that, while compilations of facts may
be subject to copyright protection insofar as the arrangement of
facts reflects creativity, the facts themselves are not subject
to protection against copying or distribution, thereby
decisively repudiating the "sweat-of-the-brow" theory of
copyrightability.  See Feist Publ'ns, Inc., v. Rural Tel. Serv.
Co., 499 U.S. 340, 359-60 (1991) ("Feist") ("[T]he 1976
revisions to the Copyright Act leave no doubt that originality,
not 'sweat of the brow,' is the touchstone of copyright
protection in directories and other fact-based works.")
Thereafter, a work must "possess[] at least some minimal degree
of creativity" in order to be protected under copyright.  Id. at
345.  At the same time, the Feist Court suggested in a
mysterious footnote that protection for "hot news" under an INS-
type misappropriation theory might survive, noting that the
"Court rendered judgment [in INS] . . . on noncopyright grounds
that are not relevant here."  Id. at 354 n.*.

     Soon thereafter, the Restatement (Third) of Unfair
Competition ("Restatement") took a similar turn.  The
Restatement, adopted by the American Law Institute in 1993,
recommended in its official commentary that the residual tort of
misappropriation, established by INS and imported into the
common law of many states, be formally abrogated.  Id. § 38 cmt.
b.  Nevertheless, the Restatement seemed to eschew closing the

door entirely on INS, acknowledging that -- despite its

preference for Justice Brandeis's dissent -- "hot news"

scenarios like those of INS constitute "unusual circumstances"

that "present the most compelling case for protection against

appropriation."  Id. § 38 cmt. c.

The question of whether a hot-news misappropriation claim

survives federal preemption was finally resolved in National

Basketball Association v. Motorola, Inc., 105 F.3d 841 (2d Cir.

1997) ("NBA").  In NBA, "[t]he crux of the dispute concern[ed]

the extent to which a state law 'hot-news' misappropriation

claim based on [INS] survives preemption by the federal

Copyright Act" and, if so, whether the plaintiff's claim fit

"within the surviving INS-type claims."  Id. at 843.  Plaintiff,

a national sports league, sued the maker of a handheld pager

sold by Motorola and marketed under the name "SportsTrax," which

displayed real-time information about professional basketball

games while they were in progress.  Id. at 843-44.  The Court of

Appeals concluded that "a narrow 'hot-news' exception does

survive preemption," given the "extra elements" of time

sensitivity, free-riding, and "the threat to the very existence

of the product or service provided by the plaintiff."  Id. at

843, 853; see also Briarpatch Ltd., L.P. v. Phoenix Pictures,

Inc., 373 F.3d 296, 305-06 (2d Cir. 2004) (articulating the

"extra elements" test for determining the scope of preemption

under § 301 of the Copyright Act).  Under NBA, the elements of

an INS claim surviving federal preemption are:

> (i) a plaintiff generates or gathers information at a
> cost; (ii) the information is time-sensitive; (iii) a
> defendant's use of the information constitutes free
> riding on the plaintiff's efforts; (iv) the defendant
> is in direct competition with a product or service
> offered by the plaintiffs; and (v) the ability of
> other parties to free-ride on the efforts of the
> plaintiff or others would so reduce the incentive to
> produce the product or service that its existence or
> quality would be substantially threatened.

NBA, 105 F.3d at 845.

The five-element NBA claim has been applied by courts in

this Circuit at least twice.  See Silver v. Lavandeira, No. 08

Civ. 6522 (JSR) (DCF), 2009 WL 513031, at *6 (S.D.N.Y. Feb. 26,

2009) (plaintiff failed to adequately plead an NBA hot-news

claim for misappropriation of facts taken from plaintiff's

website); Associated Press v. All Headline News Corp., 608 F.

Supp. 2d 454, 458-61 (S.D.N.Y. 2009) (plaintiff properly stated

claim under NBA for misappropriation of its internet news

stories).  The NBA test has also been embraced by courts outside

this Circuit.  See, e.g., ConFold Pac., Inc. v. Polaris Indus.,

Inc., 433 F.3d 952, 960 (7th Cir. 2006) (citing NBA's hot-news

formulation with approval and concluding that an "INS-type claim

probably is not preempted"); Scranton Times, L.P. v. Wilkes-

Barre Publ'g Co., No. 08 Civ. 2135, 2009 WL 585502, at *3-*4

(M.D. Pa. Mar. 6, 2009) (defendant's alleged copying of facts

from plaintiff's obituaries does not constitute hot-news misappropriation under NBA); X17, Inc. v. Lavandeira, 563 F. Supp. 2d 1102, 1104-06 (C.D. Cal. 2007) (archivist properly stated claim for misappropriation of its paparazzi photographs under the "persuasive" formulation of NBA); Pollstar v. Gigmania Ltd., No. Civ. F-00-5671 (REC), 2000 WL 34016436, at *5-*6 (E.D. Cal. 2000) (plaintiff properly stated claim for misappropriation of its time-sensitive concert information); Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc., 73 F. Supp. 2d 1044, 1049-50 (E.D. Mo. 1999) ("Moviefone") (no genuine factual dispute that defendant's publication of plaintiff's theaters' movie listings did not constitute hot-news misappropriation under NBA).  But see Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737, 756 (D. Md. 2003) (suggesting that hot-news misappropriation claim as articulated by NBA may be preempted by Copyright Act).[33]

B.    Application of the NBA v. Motorola Elements

       The parties do not dispute that the elements of the hot-news misappropriation tort under New York law are those set out

----

[33] Several legislative proposals previously introduced in Congress would have federalized a hot-news misappropriation tort based on NBA's five-element claim.  See Database and Collections of Information Misappropriation Act, H.R. 3261 (108th Cong.) (borrowing all NBA criteria except the fourth); Consumer Access to Information Act of 2004, H.R. 3872 (108th Cong.) (borrowing all five criteria).

in NBA, 105 F.3d 841.  The burden is on the Firms to establish
each of the elements of the tort, and each element is considered
in turn below.

1.   Cost of Generating Information

The first element is that a plaintiff "generates or
collects information at some cost or expense."  Id. at 852.  The
Firms collectively employ hundreds of skilled analysts and
expend hundreds of millions of dollars each year to produce
their equity research reports.  Fly does not dispute that the
Firms have incurred substantial expense in generating their
research reports and Recommendations.

2.   Timeliness of Information

Second, a plaintiff must show that "the value of the
information" generated or collected by the plaintiff "is highly
time-sensitive."  Id.  As explained by the Second Circuit prior
to NBA, the INS tort encompasses only those situations where the
defendant has published time-sensitive information "before [the
plaintiff] has been able to utilize his competitive edge."  FII,
808 F.2d at 209.

The Firms' Recommendations are clearly time-sensitive; the
"peculiar value [of research] is in the spreading of it while it
is fresh."  INS, 248 U.S. at 235.  The Firms' clients use the
analysts' opinions expressed in the Recommendations to execute

57

trades in anticipation of stock price movement in order to capture the maximum benefit from that movement.  The dissemination of this information to clients is also a highly time-sensitive endeavor.  To reap the greatest benefit from their research reports through the generation of commission income, the Firms must engage in a costly, frenzied process to try to be the first to inform their clients of the Recommendations.

Fly does not dispute that the Firms' Recommendations are time-sensitive.  To the contrary, Fly itself highlights the time sensitivity of the information that it publishes in marketing its newsfeed to potential subscribers and business partners. Likewise, in its lawsuit against TTN, Fly asserted that "the value of TheFly's newsfeed is highly time-sensitive," and that this timeliness is one of the key elements of value in the service it provides to its subscribers.

3.  Free-Riding

The third element of the NBA hot-news misappropriation tort is that "the defendant's use of the information constitutes free-riding on the plaintiff's costly efforts to generate or collect it," 105 F.3d at 852, thereby enabling the defendant "to produce a directly competitive product for less money because it has lower costs."  Id. at 854.  In INS, the Supreme Court

58

described such conduct as a competitor "endeavoring to reap where it has not sown . . . [by] appropriating to itself the harvest of those who have sown." INS, 248 U.S. at 239-40; see also Chi. Prof'l Sports Ltd. P'ship v. NBA, 961 F.2d 667, 675 (7th Cir. 1992) ("Free-riding is the diversion of value from a business rival's efforts without payment."). In essence, free-riding exists where a defendant invests little in order to profit from information generated or collected by the plaintiff at great cost.

Fly's core business is its free-riding off the sustained, costly efforts by the Firms and other investment institutions to generate equity research that is highly valued by investors. Fly does no equity research of its own, nor does it undertake any original reporting or analysis that could generate the opinions reflected in the headlines published in the "Recommendations" section of its newsfeed. Fly's Recommendation headlines consist entirely of regurgitations of the Firms' Recommendations and those of other investment institutions. Because it makes no investment of its own in equity research, Fly can sell the reprinted Recommendations at a cut-rate price to its subscribers and still make a profit. Its only cost is the cost of locating and lifting the Recommendations and then entering a few keystrokes into its newsfeed software.

Although Fly does attribute each of the Recommendations to its originating firm, if anything, the attributions underscore its pilfering. A Recommendation is valuable not because it is a fact that General Motors stock has a new target price, but because one of the Firms has opined that it has one. Investors appreciate that a Recommendation by one of the Firms reflects their very substantial investment in expert analysis and thus merits careful consideration. In contrast, there is no evidence that a Recommendation by Fly itself to buy, sell, or hold a particular stock would be given any weight whatsoever by any investor. Thus, it is essential to Fly's misappropriation of the Firms' research capital that it connect each Recommendation to its source.

Fly vigorously disputes that it "free-rides" on the Firms' efforts, but its arguments are not persuasive. First, Fly argues that it itself invests substantial resources to quickly gather, edit, and disseminate financial news from various sources. To the extent that Fly adds value through its collection and aggregation of information, however, the value reflected in that act of aggregation does not controvert the fact that Fly expends no effort to produce the Recommendations and does not contribute to the underlying research and analysis process.

Second, Fly argues that for the last few years it has not been free-riding off the Firms' efforts because it no longer lifts the Recommendations from the Firms' research reports, but instead relies on others' headlines, thereby establishing in Fly's view that the Recommendations have become "public" and free for the taking. It points to the frequent publication of the Recommendations by other news services, both mainstream and internet, in advance of Fly's own publication of headlines and to the widespread discussion of the Recommendations in market chat rooms and "blast IMs," among other sources.

The fact that others also engage in unlawful behavior does not excuse a party's own illegal conduct. Although the practices of other potentially liable parties is highly relevant to the fashioning of equitable relief and will be considered below, the conduct of third parties is simply of no moment in finding Fly liable for hot-news misappropriation. Similarly, even if true, it is not a defense to misappropriation that a Recommendation is already in the public domain by the time Fly reports it. In INS, for example, AP's news was already widespread and publicly available on the East Coast and was obtained by the defendant from public sources, and yet, the Court granted an injunction against INS's further dissemination of news gained through those means. INS, 248 U.S. at 245-46; see also Bond Buyer, 267 N.Y.S.2d at 946 (enjoining defendant's

misappropriation of plaintiff's bond-market reports even though
they were already in the public domain).[34]

Moreover, Fly's reliance on the widespread discussion of
the Firms' Recommendations among participants in the securities
marketplace should be placed in the proper context.  First, it
is undisputed that the Firms have made a very substantial and
costly effort to study the unauthorized dissemination of their
research reports and, harnessing the resulting insights, to work
to plug the leaks they have found.  Second, whatever the effect
of Fly's conduct, it is unavoidable that the Firms' broad,
client-based dissemination model will nonetheless result in news
of their Recommendations being spread quickly from one investor
to another.  Nevertheless, the legally salient fact in this
milieu is not that actors in the marketplace repeat news of
Recommendations to their friends and colleagues, such that the

---

[34] Since it does not matter whether Fly has taken its headlines
directly from the Firms' research reports or elsewhere, it is
not necessary to decide the credibility of Fly's description of
its current methodology for researching the Firms'
Recommendations, nor to decide which of the putative sources for
its headlines could properly be considered "public" in nature.
It bears mention on this point, however, that it became clear at
trial that Fly's assertion to the Firms during fact discovery
that it had explicit confidentiality agreements with its sources
is false.  It had no such agreements, and it further
appears implausible that it had any implicit understanding of
confidentiality with any source.  Most of its putative sources
were published reports by others, chat room conversation with
scores of persons who did not know each other, or "blast IMs" to
mass groups.  At best, Etergino had a working relationship with
various individuals to share information with one another
because they found the exchange to be mutually beneficial.

word inevitably gets out.  Rather, it is that Fly is exploiting

its self-described "hefty relationships with people in the know"

to gather information from the rumor mill and run a profitable

business dedicated, in large part, to systematically gathering

and selling the Firms' Recommendations to investors.  Cf. INS,

248 U.S. at 239 ("The right of the purchaser of a single

newspaper to spread knowledge of its contents gratuitously . . .

may be admitted; but to transmit that news for commercial use,

in competition with complainant . . . is a very different

matter.")  Fly was one of the first to engage in this practice

and one of its most ardent, and successful, early practitioners.

That reporting Recommendations has become a common practice

since Fly developed the business, or that one can readily catch

wind of Recommendations by participating in the Wall Street

rumor mill, does not excuse Fly's systematic misappropriation.

     Fly's argument that its practices are in accordance with

prevailing industry norms -- that, in essence, no one "owns"

financial information once it is released -- is further

undermined by Fly's use of the hot-news misappropriation theory

to sue one of its competitors, TTN.  That lawsuit was premised

on the notion that Fly has a proprietary, excludable interest in

the Recommendations that it reports on its newsfeed.  Fly

described its newsfeed as containing "proprietary and

economically valuable material that is intended to assist its

subscriber's [sic] in making investment decisions," and asserted that the "value of the newsfeed to TheFly's subscribers is greatly enhanced by its limited dissemination, i.e., its exclusivity."  While Fly is not now estopped from asserting otherwise, such a total reversal in position from one litigation to the next casts serious doubt on the sincerity of its arguments.

Finally, in an argument relevant to both the third and fourth elements of the NBA hot-news claim, Fly asserts that it reports "much more" than the Firms' Recommendations.  It reports equity recommendations from as many as sixty-five different investment firms, and its newsfeed includes "a broad range of financial news and data" falling within ten categories.  This argument fails as well.  In INS, for example, the defendant was liable notwithstanding the fact that only one narrow aspect of its business constituted misappropriation: the reporting of news about military and political developments in Europe during World War I.  Similarly, in Bond Buyer, the defendant's publishing activities went far beyond the prohibited conduct, but that fact was immaterial.  Bond Buyer, 267 N.Y.S.2d at 945-46.  Nor can Fly escape liability by pointing to its selectivity or to the existence of Recommendations that it chooses not to publish. Cf. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 564-65 (1985) ("Harper & Row") (denying a "fair use"

defense to copyright infringement where the defendant's taking
was limited, but verbatim and "essentially the heart of the
book"); Nikkei, 166 F.3d at 72 (a copyright infringer cannot
"excuse the wrong by showing how much of [the plaintiff's] work
he did not pirate" (citation omitted)); Wainwright, 558 F.2d at
96 (finding liability where the defendant's taking was limited,
but included "the most creative and original aspects of the
reports, [which were] the financial analyses and predictions").

    4.  Direct Competition

    The fourth element is that "the defendant's use of the
information is in direct competition with a product or service
offered by the plaintiff." NBA, 105 F.3d at 852.  The INS court
held that a defendant may pursue "any legitimate purpose not
unreasonably interfering with complainant's right to make
merchandise of [its news]," INS, 248 U.S. at 239, but that he
may not engage in "an unauthorized interference with the normal
operation of complainant's legitimate business precisely at the
point whether the profit is to be reaped, in order to divert a
material portion of the profit from those who have earned it to
those who have not."  Id. at 240.  To be sure, misappropriation
requires that the competition be sufficiently direct.  In NBA,
the plaintiff -- whose "primary business" was producing live
basketball games and licensing copyrighted broadcasts of those

games -- was not in direct competition with the defendant, which
sold and marketed a pager featuring real-time sports data.  The
collection and retransmission of strictly factual material about
the games was, at best, collateral to the plaintiff's business.
NBA, 105 F.3d at 853; see also id. at 853 n.8 ("While courts
have recognized that one has a right to one's own harvest, this
proposition has not been construed to preclude others from
profiting from demands for collateral services generated by the
success of one's business venture." (citation omitted)); U.S.
Golf Ass'n v. St. Andrews Sys., Data-Max, Inc., 749 F.2d 1028,
1029-30 (3d Cir. 1984) (defendant's use of golf handicapping
formula did not constitute misappropriation under INS because
the defendant did not "compete directly" with plaintiff or
"interfere with [its] economic incentives").

     The Firms have shown that they and Fly are in direct
competition in disseminating Recommendations to investors for
their use in making investment decisions.  The production and
dissemination of equity research reports, and the
Recommendations from those reports, is one of the "primary"
businesses for each of the Firms.  Production of research is
central to the Firms' services to their clients and to their
competition with other investment banks and brokerage services.
The Recommendations, in turn, reflect the heart of that
research, and are its most valuable element; for many of the

Firms' clients, news of the Recommendations alone is enough to entice the clients into making a trade.

Likewise, the dissemination of the Recommendations is the "primary business" of Fly.  It has built its most valuable section of its newsfeed around the delivery of that core product and aptly names that section: "Recommendations."  It touts its ability to be the "fly on the wall" inside the Firms, listening to the opinions of the analysts as they are delivered, and advertising its newsfeed as "a valuable resource for any investment decision."  Moreover, Etergino admitted that these Recommendations, which he characterized at trial as "snippets," are intended to assist Fly's subscribers in making investment decisions.  Thus, Fly's extensive and systematic use of the Firms' Recommendations is undertaken "with the obvious intent, if not the effect, of fulfilling the demand for the original work."  Wainwright, 558 F.2d at 96 (citation omitted).  To the extent that Fly succeeds in fulfilling that demand, it is directly to the plaintiffs' detriment, not a mere collateral windfall.

Both the Firms and Fly even use similar, and in some instances identical, channels of distribution.  The Firms deliver their research reports directly to their client investors through access-controlled media, and Fly runs a subscription website.  The Firms and Fly also license third-

party distributors, including several of the same media giants,
to provide their content to entitled recipients.

Finally, Fly has taken steps to compete even more directly
with the Firms by aligning itself with discount brokerage
services such as Cyber Trader, eSignal, and NewsWare. Fly's
efforts, which have met with some success, to link its
subscribers to discount brokerage services reflect the final
stage in its direct competition with the Firms by leveraging its
access to their Recommendations and driving away their
commission revenue. Whether Fly succeeds in directly linking
every one of its subscribers to a discount broker, however, is
beside the point. The Firms have shown that the ability of
their clients to obtain their Recommendations elsewhere has had,
and will continue to have, a direct impact on their generation
of commission revenue. As Browning testified, her Firm "loses
potential clients who otherwise might do business with the Firm
if they can get timely and regular access to our research
recommendations" elsewhere.

Despite this extensive and essentially undisputed evidence
of direct competition, and despite having previously asserted
counterclaims against the Firms for their unfair competition
with Fly, Fly argues that it does not compete with the Firms.
Fly maintains that NBA should be interpreted to require proof of
"head-to-head competition in a primary market," and argues that

the Firms and Fly do not fit that proffered standard.  While the
Firms offer brokerage services, Fly is a news service
retransmitting "strictly factual material about the financial
markets" and does not provide brokerage, investment advice, or
other financial services.[35]  While it may be true that Fly is a
news aggregator and is in direct competition with other
financial news aggregators, both large and small, each of these
news aggregators is in direct competition with the Firms when
they report the Firms' Recommendations in a timely and
systematic manner such that the Firms are deprived of the
opportunity to communicate them first-hand to their clients.
Moreover, to the extent that Fly argues that it does not compete
with the Firms because it reports "news" about the
Recommendations rather than the Recommendations itself -- a
theoretical distinction not borne out in reality -- such an
argument apparently overlooks the fact that "news" is, in fact,
the archetypal subject matter of a hot-news misappropriation
claim.

Second, Fly notes that it reports only Recommendations and
no longer lifts or summarizes passages from the Firms'

---

[35] Etergino explains that "[t]he Firms and their market
recommendations are the news -- each of the Firms has a
reputation in the financial industry, such that their actions
and recommendations have the potential to influence the market's
valuation of equity securities, and are widely reported as news
in the financial press."

underlying research reports.  Etergino offers that, in his
opinion, the Recommendations are but one factor on which
investors rely in making investment decisions, and that
investors value the research report itself highly.  This
argument is quickly addressed.  The premise underlying Fly's
entire business is that immediate access to the Recommendations
alone is extremely valuable.  It is lucrative, of course,
because the market understands that the Recommendations emanate
from respected sources that have invested substantial resources
in formulating the Recommendations and that detailed research
reports are available to explain the underlying analyses.  As
trading volume and market movements demonstrate, many clients
who generate significant commission income for the Firms are
volume traders who quickly trade on the Recommendations with
little or no opportunity to scrutinize and evaluate the actual
research reports at their leisure.  It was not contested at
trial that many large-scale investors trade on the
Recommendations alone and that those Recommendations capture the
critical content of the research report.

Third, Fly has occasionally made the argument that it
merely reports what has "already happened" in the marketplace.
The basis for this argument appears to be Fly's untested
hypothesis that the Firms' Recommendations are absorbed (or
"discounted") into the price of the stock immediately, such that

-- by the time Fly posts them on its newsfeed -- the market has already adjusted to the information even though the market may not open for trading for hours.  If such a statement were true, however, Fly would gain relatively little value from collecting and publicizing the information.  Moreover, Fly's own promotional material makes clear that the value that Fly intends to offer to its subscribers is to inform their investment decisions and to allow them to cash in on the Firms' equity research through making timely trades.

    5.    Reduced Economic Incentives

    The final element of the hot-news misappropriation tort is that "the ability of other parties to free-ride on the efforts of the plaintiff would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened."  NBA, 105 F.3d at 852.  So phrased, the element requires the plaintiffs to demonstrate not that their business has already sustained serious damage at the hands of the defendant, but rather, but that the conduct of Fly and other similar parties, if permitted to continue, would be likely substantially to threaten plaintiffs' ability to continue to participate in the market.  As with the other four, this fifth element finds inspiration in INS, which observed that "by permitting indiscriminate publication by anybody and everybody

71

for purposes of profit in competition with the news-gatherer, it would render publication profitless, or so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison with the return."  INS, 248 U.S. at 241.  The INS holding cannot be understood without understanding the court's desire to "afford compensation for the cost of gathering and distributing [the news], with the added profit so necessary as an incentive to effective action in the commercial world."  Id. at 235.  This final element also helps to align the tort with the overriding public interest, so that it serves to protect socially valuable products or services in danger of being under-produced.

The Firms have supplied ample evidence that the continued conduct of Fly, and others like Fly, would so reduce their incentive to invest the resources necessary to produce equity research reports that the continued viability of plaintiffs' research business is and "would be substantially threatened."  Indeed, the conduct of Fly and others has, along with other unrelated factors, already reduced the resources devoted to the research aspect of the Firms' business.  The ability of the Firms to "monetize" their research is critical to its continued production.  Thus, the factual scenario at the heart of the hot-news misappropriation doctrine exists here.

> If services like AP were not assured of property rights in the news they pay to collect, they would cease to collect it. The ability of their competitors to appropriate their product at only nominal cost and thereby to disseminate a competing product at a lower price would destroy the incentive to collect news in the first place.

NBA, 105 F.3d at 853.

Fly's arguments to the contrary are unpersuasive. First, Fly observes that the Firms have failed to provide statistical evidence to show that they have lost customers, trades, or (ultimately) profit because of Fly's conduct, and have relied instead on speculative, self-serving lay opinions. Fly, however, misapprehends the nature of what must be proved to sustain the fifth element and win injunctive relief. The Firms do not need to show that Fly has directly caused them actual, quantifiable damage -- rather, they must show that the free-riding, if left unrestrained, "would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened." NBA, 105 F.3d at 845 (emphasis added). INS itself required no direct proof of lost profits in order to sustain a permanent injunction against unfair competition. INS, 248 U.S. 241 (noting the "obvious

results" of INS's conduct in terms of its effect on AP's profitability).[36]

Fly's evidentiary challenges are also without merit.  The plaintiffs' witnesses who testified about these matters were senior research executives, that is, the very individuals in the best position to understand their Firms' business models and the budget decisions behind the investment being made in research.  Moreover, to the extent that they testified regarding their opinion, it was to matters that were "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue," United States v. Yannotti, 541 F.3d 112, 125 (2d Cir. 2008) (citation omitted), and thereby constitute proper lay opinion testimony under Fed. R. Evid. 701.[37]  Moreover, common sense and the circumstantial evidence about the plaintiffs' business model make the Firms' contentions about its reduced

---

[36] Fly also cites as authority certain dicta from Moviefone, where a federal district court in Missouri interpreted NBA to require proof that "defendant's actions must make plaintiff virtually cease to participate in the business in question." Moviefone, 73 F. Supp. 2d at 1050.  This statement, which is not controlling authority in this Circuit, misconstrues the plain meaning of the fifth element of the NBA test.

[37] In response to Fly's motion in limine, certain passages were stricken from the proffered direct testimony of the Firms' witnesses.  Once those passages had been stricken, Fly had no further objection at trial as to any portion of the direct testimony on the ground that it was inadmissible opinion testimony or on any other ground.

incentives utterly credible.  Why should any business invest substantial sums in an activity that does not contribute to the bottom line?

Second, Fly asserts that it is not alone in reducing the Firms' incentives to invest in equity research.  This argument again misapprehends the nature of the showing that the Firms must make to satisfy the NBA test.  NBA provides that the plaintiffs must show that the ability of "other parties," which may include the defendant as well as others, to free-ride on the efforts of the plaintiffs would substantially reduce incentives to produce the equity research.  105 F.3d at 845; see INS, 248 U.S. 241 (considering the effects of "indiscriminate publication by anybody and everybody" on AP's newsgathering incentives). Again, to the extent that the phenomenon of rapid and systematic unauthorized distribution of the Firms' Recommendations extends beyond Fly -- and it does -- that does not provide Fly with a defense, but it will affect the terms of the injunction.

Third, Fly argues that other factors in the marketplace have threatened production of equity research.  These factors include the burst financial bubble and an extended recession; the Global Research Analyst Settlement between federal and state regulators and Wall Street investment firms in April 2003; and the availability of discount electronic trading platforms as a low-cost alternative to the Firms' full-rate trade execution

services.  These discount brokerage firms are able to offer
cheaper trading services in part because they do not generate
their own equity research and bear any of the associated costs.
There is no need to measure the exact impact that each of these
events has had on the Firms and their investment in research.
It suffices that the Firms presented persuasive evidence that
shows that, these other events aside, the misappropriation of
their Recommendations by Fly and others has also had a profound
effect on their business model.

C.    Scope of Injunctive Relief

     Fly's liability for hot-news misappropriation having been
established, the proper scope of injunctive relief must be
determined.  In so doing, matters of public policy will help
shape the decisions to be made.  Courts granting equitable
relief, such as a permanent injunction, "may go much further
both to give or to withhold relief in furtherance of the public
interest than where only private interests are involved."
Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 424 (2d Cir.
2004) (citation omitted).  Thus, before explaining the features
of the injunction that will issue, the policies that have
informed the scope of the injunction will be described.

1.    Public Policy Considerations

It was undisputed at this trial, and explicitly conceded by Fly, that the production of equity research in general, and its production by the plaintiff Firms specifically, is a valuable social good.  Such research plays a vital role in modern capital markets by helping to disclose information material to the market, to price stocks more fairly and, as a result, to produce a more efficient allocation of capital.  Although the gains from immediate trading and rapid stock movement based on knowledge of Recommendations may be realized initially only by sophisticated investors, all market participants benefit from a market operating to align prices with underlying value as quickly as possible.  Indeed, three decades of jurisprudence in federal securities law have built upon the understanding that investors may rely in bringing a securities fraud lawsuit on the integrity of the market price of a stock to create a presumption of transaction causation.  See Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988).  The fraud-on-the-market theory reflects a belief that in complex and interconnected financial markets, the market "act[s] as the unpaid agent of the investor" and "transmits information to the investor in the processed form of a market price."  Id. at 244 (citation omitted).  Although the fraud-on-the-market theory is subject to important limitations -- for example, it cannot be applied where a market is illiquid

or otherwise inefficient, see Teamsters Local 445 Freight Div.
Pension Fund v. Bombardier Inc., 546 F.3d 196, 204-11 (2d Cir.
2008) -- it is noteworthy that one of the factors frequently
considered by courts in deciding whether a particular securities
market is "efficient" is the "number of securities analysts
following and reporting on" the securities and "mak[ing]
buy/sell recommendations to client investors." Id. at 200, 205
(citation omitted); see also In re Xcelera.com Sec. Litig., 430
F.3d 503, 514 (1st Cir. 2005).  Because the availability of the
detailed and sophisticated analysis that can appear in research
reports, which are the basis for the Recommendations, depends
upon their producer's ability to reap a benefit from producing
it, research reports' analyses of corporations will be
underproduced unless the Firms can achieve an economic return on
their investment.

It is also worth bearing in mind that the Recommendations
are not objective facts, but rather, subjective judgments based
on complex and imperfect evidence.  In this sense, the
Recommendations produced by the Firms represent the kinds of
information to which the Court of Appeals has seen fit to extend
protection under copyright laws.  Such information has been
described as "soft facts" or "soft ideas infused with taste or
opinion," and explicitly includes items such as subjective
valuations or target prices.  CCC Info. Servs., Inc. v. Maclean

Hunter Mkt. Reports, Inc., 44 F.3d 61, 67, 72 (2d Cir. 1994)
(defendant's copying of "virtually the entire compendium" of
used car price valuations, created based on authors' creative
"predictions" and "professional judgment," constituted copyright
infringement); see also CDN Inc. v. Kapes, 197 F.3d 1256, 1260
(9th Cir. 1999) (estimated wholesale valuations for collectible
coins copyrightable because subjective).

The public interest in the production of equity research
notwithstanding, there is also a competing, and no less
important, public interest in "unrestrained access to
information," particularly when the information is heavily fact-
based.  FII, 808 F.2d at 207.  Widespread access to information
is critical to "the progress of Science and the useful Arts,"
U.S. Const. art. I, § 8, cl. 8, and it is in part for this
reason that Congress and the courts have declined to extend
copyright protection to pure facts.  See Harper & Row, 471 U.S.
at 558; CCC, 44 F.3d at 69.  It is clear that widespread access
to financial information on reasonable terms is essential to
strong financial markets.  Giant institutional investors may not
prevent others from listening in on important conversations
about the value of securities.  For this reason, the Firms
appropriately conceded at trial that there is, and should be, an
"ordinary presumption in favor of the free flow of information."

Plaintiffs seek only that the incentives be preserved to create the activity that generates that information in the first place.

Ultimately, the purpose of the INS tort, like the traditionally accepted goal of intellectual property law more generally, is to provide an incentive for the production of socially useful information without either under- or over-protecting the efforts to gather such information.  A balance must be struck between establishing rewards to stimulate socially useful efforts on the one hand, and permitting maximum access to the fruits of those efforts to facilitate still further innovation and progress on the other.  What the Supreme Court said in Harper & Row on the subject of copyright protection is no less applicable here: "The challenge of copyright is to strike the difficult balance between the interests of authors . . . in the control and exploitation of their writings . . . on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand."  Harper & Row, 471 U.S. at 580 (citation omitted); see also CCC, 44 F.3d 69 n.13; United States Golf Ass'n, 749 F.2d at 1038-39.  Cognizant of the balance that must be struck, the Second Circuit explicitly reaffirmed the existence of a narrow hot-news misappropriation cause of action because, without one, "[t]he newspaper-reading public would

suffer because no one would have an incentive to collect 'hot news.'"  <u>NBA</u>, 105 F.3d at 853.

     The balance of these considerations strongly supports the injunctive relief that will be ordered in this action.  This injunction, unlike those issued in <u>Board of Trade v. Dow Jones & Co., Inc.</u>, 456 N.E.2d 84 (Ill. 1983), or <u>Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.</u>, 683 F.2d 704 (2d Cir. 1982), will not grant plaintiffs an effective monopoly over a particular financial concept, formula, or line of business.  Anyone, including Fly, remains free to conduct equity research, write research reports, and make Recommendations.  Nor will Fly be restrained with respect to any element of its newsfeed that does not involve reporting the Firms' Recommendations or conference call access information.  An injunction with a limited period of exclusivity for the dissemination of a Firm's Recommendations will, however, preserve the incentive to create equity research and ultimately spread the benefits of that research to all investors through the operation of the markets.

     2.   Length of Temporal Protection

     Injunctive relief must be carefully crafted.  Fed. R. Civ. P. 65(d) provides that "[e]very order granting an injunction . . . must state the reasons why it issued; state its terms specifically; and describe in reasonable detail -- and not by

referring to the complaint or other document -- the act or acts restrained or required."  The Court of Appeals has interpreted this standard to require that it be "ascertain[able] from the four corners of the order precisely what acts are forbidden or required."  Petrello v. White, 533 F.3d 110, 114 (2d Cir. 2008) (citation omitted).  In the intellectual property context, an injunction protecting against further disclosure of proprietary information must be "narrowly tailored" to avoid placing "unnecessary burdens on lawful commercial activity," Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 119 (2d Cir. 2009) (citation omitted), or on conduct that was not the subject of this case.  Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 221 (2d Cir. 2003).  An injunction that does not provide such specificity will fail for being "impermissibly vague."  Corning Inc. v. PicVue Elecs., Ltd., 365 F.3d 156, 157 (2d Cir. 2004) (per curiam).

     The length of time for which the Firms should be protected from unauthorized redistribution or repetition of their Recommendations is the most important question to be determined. Ordinarily, "[t]he originator of valuable information . . . has an opportunity to exploit the advantage of a lead time in the market," thereby "provid[ing] the originator with an opportunity to recover the costs of development and . . . encourag[ing] continued investment."  Restatement § 38 cmt. c.  In INS, the

82

Supreme Court described this lead time for exploitation of the news as the period "until its commercial value as news to the complainant and all of its members has passed away."  Id. at 245 (emphasis omitted).

In this case, the goal is a period of lead time long enough to enable the Firms to conduct a reasonable sales effort and to retain the advantage of being the first to reach key institutional investors who may react promptly to a Firm's Recommendation.  Where the investor will require a more sustained consultation with the Firm or wish to ponder the research report in more depth, however, it is unnecessary to restrict unauthorized dissemination of the Recommendations.  In those instances, the research reports themselves retain value even though their Recommendations may be widely known.  With the right lead time, the Firms will retain an incentive to create their research, but they will not be given a vise to squeeze every last cent out of their efforts to the exclusion of others.

Plaintiffs seek an injunction against reporting a Recommendation for four hours from the release of a research report or until 12:00 p.m., whichever is later in time.[38]  They contend that only this length of time is able to restore "breathing room for a reasonable sales and trading effort."

---

[38] The Firms had initially requested an injunction of the later of four hours or 1:00 p.m.

Fly, without conceding liability, argues that the injunction should last no longer than ten minutes from the release of the report to a Firm's customers, which is usually hours before the market opens.

There are three time frames for the length of an injunction that should be considered, at least in connection with the majority of research reports, that is, those released in the early morning hours when the markets are still closed.  These time frames, each of which begins upon the release of the Recommendation, last as follows: (1) for some length of time ending before the 9:30 a.m. market opening; (2) for some relatively limited period ending just after the 9:30 a.m. market opening; and (3) for a period of hours after market opening, up to the two-and-one-half hours requested by the Firms.

Upon careful consideration, it is apparent that it is the middle alternative that is superior.  This time frame preserves incentives for the Firms to create and disseminate research reports to their investor clients, while still recognizing the inevitable, fast-moving, and widespread informal communication of Recommendations on Wall Street.  Because this time frame will not fully insulate the Firms from the pressures of adjusting to the rapidly evolving informational marketplace, it will also motivate the Firms to continue to explore ways to improve and expedite the dissemination of their research.

The first time frame would be too short.  Embargoing the Recommendations so that they cannot be reported by Fly before the market opens, whether that be for ten minutes after the release of research reports or right up to the 9:30 a.m. opening of the market, would be inadequate to preserve the Firms' incentive to invest in producing research for their clients. The Firms' engage in hours of effort, beginning at 8:00 a.m., to reach certain key clients and communicate their Recommendations. The Firms must have some significant amount of time to reach those clients and for those clients to be in a position to trade on that information by placing and executing orders through the Firms.  Any injunction that does not include a period after the opening of trading will in all likelihood interfere with the incentive of the clients to place their trades through the Firms.

Conversely, the Firms have not shown that an injunction lasting for several hours after the market opening is necessary to preserve their incentive to create high-quality research reports.  While they showed that their intensive outreach and sales program lasted at least that long, if not longer, they did not show that the clients who they reached in the mid-to-late morning period were the clients who were likely to trade on Recommendations alone, as opposed to those who wanted an explanation of the research reports and the reasoning behind

85

their Recommendations.  Thus, they did not show that the longer injunction against unauthorized systematic dissemination of the Firms' Recommendations was necessary to protect the incentive to create the report itself.[39]  The Court declines to provide relief beyond that minimum level of protection necessary to ensure that a socially valuable product is not driven out of the market through unfair competition.

As a result, in the case of research reports released when the market is closed, an injunction will issue forbidding the dissemination of the Firms' Recommendations until one half-hour after the opening of the New York Stock Exchange or 10:00 a.m., whichever is later.  As a practical matter, this will give the Firms one-and-a-half hours to reach the clients who are most likely to trade upon the knowledge of the Recommendation alone and to give the Firms an opportunity to have any trading by clients based on those Recommendations placed through the Firms and to have those trades executed.

For Recommendations issued while the market in New York is open for trading, the defendant will be enjoined from publishing the Recommendations until two hours after their release by the Firms.  For the same reasons stated above, such a period is

---

[39] While the Court could have benefited from expert testimony about the trading patterns of different investors and during different periods of the day, ultimately the parties provided sufficient evidence to permit lines to be drawn regarding the length of the injunction with sufficient confidence.

sufficient to enable the Firms to notify certain key clients of those Recommendations, to conduct a reasonable sales and trading effort, and to generate an economic return on their research investment.

> 3.    Exception for Non-Systematic, Contextual Reporting
>        After the Market Opens

It is also important to distinguish between the aggregation and repetition of the Firms' Recommendations and limited, justifiable uses of such information.  Liability for hot-news misappropriation extends only to a narrow category of competitive conduct: free-riding activity that is directly competitive with the Firms' production of time-sensitive information, thereby substantially threatening their incentive to continue in the business.  Conduct by Fly that falls short of this standard would not violate New York common law and, therefore, should not be enjoined.  Drawing this line may be difficult, but it is nonetheless necessary to do.  Thus, to the extent Fly alters its business and begins to engage in actual analysis of market movements, and refers on occasion after the market opens in New York to one of the Firms' Recommendations in **the context of independent analytical reporting on a significant**

**market movement that has already occurred that same day**, such conduct will not run afoul of the injunction.[40]

    4.    One-Year Reevaluation

    Since Fly first built its business around the misappropriation of the Firms' Recommendations, the practice of posting the Firms' Recommendations has become a widespread phenomenon.  It would be unjust to restrain Fly from publishing the Firms' Recommendations if the Firms were to acquiesce in the unauthorized publication of their Recommendations by others, be they small internet news services or global news empires.  As Fly acknowledged at trial, it will not be disadvantaged relative to its competitors by not being able to publish the Firms' Recommendations if its competitors are restrained as well.  Consequently, one year from the issuance of this injunction, Fly may apply to modify or vacate the **injunction in the event that it can demonstrate that the Firms have not taken reasonable** steps to restrain the systematic, unauthorized misappropriation of their Recommendations, for instance, through the initiation of litigation against any parties with whom negotiation proves unsuccessful.[41]

---

[40] In the event that Fly uses this exception to make an end-run around the injunction, the Firms may apply to the Court for an amendment to the injunction.

[41] At trial, the Firms agreed that one year would be a reasonable and appropriate interval for such a review.

## CONCLUSION

The Clerk of Court shall enter judgment for the plaintiffs on both the copyright claim and the hot-news misappropriation claim.  A permanent injunction restraining the defendant from further copyright infringement and misappropriation accompanies this Opinion and Order.  Plaintiff Morgan Stanley is awarded $6,000 in statutory damages, and plaintiff Barclays Capital is awarded $6,750 in statutory damages, each with prejudgment interest as set forth above.  Plaintiffs are directed to submit an application for attorney's fees as set out in a scheduling Order accompanying this Opinion.

SO ORDERED:

Dated:    New York, New York
          March 18, 2010

                              _Denise Cote_
                              DENISE COTE
                         United States District Judge