UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                        :
BARCLAYS CAPITAL INC., MERRILL LYNCH,   :
PIERCE, FENNER & SMITH INCORPORATED,    :
AND MORGAN STANLEY & CO. INCORPORATED,  :    06 Civ. 4908 (DLC)
                                        :
                  Plaintiffs,           :
                                        :    OPINION & ORDER
             -v-                        :
                                        :
THEFLYONTHEWALL.COM,                    :
                                        :
                  Defendant.            :
                                        :
---------------------------------------- X

Appearances:

For Plaintiffs:
R. Bruce Rich
Benjamin E. Marks
Jonathan Bloom
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

For Defendant:
Glenn F. Ostrager
Joshua S. Broitman
Ostrager Chong Flaherty & Broitman P.C.
570 Lexington Avenue
New York, NY 10022

DENISE COTE, District Judge:

    This lawsuit, brought by three large financial services

firms (collectively, the "Firms") involves claims of copyright

infringement and "hot-news" misappropriation against a financial

news aggregator, Theflyonthewall.com ("Fly"), arising out of

Fly's regular and systematic dissemination on its online

newsfeed of the Firms' valuable, time-sensitive equity research recommendations ("Recommendations").  After Fly conceded liability for copyright infringement, a non-jury trial was held to determine liability on the misappropriation claim.  Following a four-day bench trial, this Court found for the Firms.  See Barclays Capital Inc. v. Theflyonthewall.com, Inc., __ F. Supp. 2d __, No. 06 Civ. 4908 (DLC), 2010 WL 1005160 (S.D.N.Y. Mar. 18, 2010) (the "March 18 Opinion").  A permanent injunction was entered restraining Fly from reporting headlines about the Firms' Recommendations before one half-hour following the market opening or two hours after the Recommendation is released, whichever is later.  See Barclays Capital Inc. v. Theflyonthewall.com, Inc., No. 06 Civ. 4908 (DLC), Dkt. No. 138 (S.D.N.Y. Mar. 18, 2010) (the "Injunction").  Familiarity with the March 18 Opinion and the Injunction are assumed.

On April 9, 2010, Fly appealed this case to the Court of Appeals for the Second Circuit.[1]  On April 13, Fly moved pursuant to Federal Rule of Civil Procedure 62(c) to stay the Injunction, or in the alternative, to modify the Injunction so that Fly is permitted to report on the Firms' Recommendations as soon as a "mainstream" news service has published them.  Fly has not moved for an expedited appeal, but represents that it will do so once

---

[1] Fly appeals from the finding of liability on the hot-news misappropriation claim as well as the award of attorney's fees and prejudgment interest on the copyright infringement claim.

this motion is resolved.  For the following reasons, Fly's motion for a stay or modification of the Injunction is denied.

DISCUSSION

I.   Fly's Stay Application

"A stay is not a matter of right, even if irreparable injury might otherwise result.  It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case."  Nken v. Holder, 556 U.S. __, 129 S. Ct. 1749, 1760 (2009) (citation omitted).  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."  Id. at 1761.  The four factors to be considered by a court in deciding whether to issue a stay pending appeal are:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Id. (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)); see also In re World Trade Ctr. Disaster Site Litig., 503 F.3d 167, 170 (2d Cir. 2007) ("In re WTC").  Although "[t]he first two factors . . . are the most critical," Nken, 129 S. Ct. at 1761, "the degree to which a factor must be present varies with the strength of the other factors, meaning that more of one

3

factor excuses less of the other." In re WTC, 503 F.3d at 170
(citation omitted); see also Thapa v. Gonzales, 460 F.3d 323,
334 (2d Cir. 2004).  A stay is proper, for example, where the
plaintiff can "demonstrate[] some possibility of success and the
balance of hardships tips decidedly in his favor." Thapa, 460
F.3d at 335.

A.   Likelihood of Success on the Merits

The first factor to be considered is "whether the stay
applicant has made a strong showing that he is likely to succeed
on the merits." Nken, 129 S. Ct. at 1761.  There is no precise
threshold of probability that must be demonstrated in order to
satisfy this factor.  See Mohammed v. Reno, 309 F.3d 95, 101 (2d
Cir. 2002) ("The necessary 'level' or 'degree' of possibility of
success will vary according to the court's assessment of the
other stay factors." (citation omitted)).

Fly's liability for hot-news misappropriation resulted from
an application of the five-element formulation of that tort
under New York law as articulated in Nat'l Basketball Ass'n v.
Motorola, 105 F.3d 841 (2d Cir. 1997) ("NBA").  Those elements
are as follows:

> (i) a plaintiff generates or gathers information at a
> cost; (ii) the information is time-sensitive; (iii) a
> defendant's use of the information constitutes free
> riding on the plaintiff's efforts; (iv) the defendant
> is in direct competition with a product or service
> offered by the plaintiffs; and (v) the ability of

> other parties to free-ride on the efforts of the
> plaintiff or others would so reduce the incentive to
> produce the product or service that its existence or
> quality would be substantially threatened.

Id. at 845.  Fly conceded at trial that NBA governs the Firms'

misappropriation claim, but argued that the Firms could not

demonstrate that all five elements were satisfied.

In its application for a stay, Fly asserts two bases for

challenging the finding of liability in the March 18 Opinion.[2]

First, Fly asserts that there is a "substantial question" as to

"whether a news service such as Defendant's is in 'head-to-head'

direct competition with the plaintiffs, which are investment

banks."  Second, Fly questions "whether plaintiffs have made the

necessary evidentiary showing of a substantial threat to their

incentive to continue in the business."

Fly has not demonstrated a likelihood of success on appeal.

Fly does not contend that the Court committed any legal error in

its analysis.  Instead, Fly's two arguments challenge the

findings of fact with respect to the fourth and fifth elements

of the NBA test.  Those findings were based on record evidence

as well as the Court's assessments of witness credibility at

---

[2] In its reply brief, Fly asserts that "the factor of 'likelihood
of success' should therefore be neutral at best in the Court's
evaluation of the stay and should not weigh against providing
relief."  This statement appears to be the product of a careless
choice of words, as Fly elsewhere contends that the likelihood-
of-success factor favors a stay.

trial.[3]  As outlined in the March 18 Opinion, there was considerable factual support to sustain the fourth and fifth elements of the misappropriation tort as outlined in NBA.

With respect to the fourth element, Fly repeats its argument at trial that the parties are not in "direct competition" because Fly is a media company and the Firms are financial services companies.  This abstract observation notwithstanding, the evidence at trial showed that Fly and the Firms are, in fact, in direct competition with respect to the market at issue in this litigation: the market for disseminating equity research Recommendations.  March 18 Opinion, 2010 WL 1005160, at *24.  Fly even admitted at trial that its dissemination of the Recommendations is undertaken to assist Fly's subscribers with making investment decisions, as Fly's efforts to link its subscribers to discount brokerage services amply demonstrated.  Id. at *24-*25.[4]

---

[3] Findings of fact made following a bench trial are subject to deferential "clearly erroneous" review, while the Court of Appeals reviews de novo the district court's "resolution of mixed questions of fact and law."  APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc., 592 F.3d 108, 110 (2d Cir. 2010) (citation omitted); see also Vazquez v. GMD Shipyard Corp., 582 F.3d 293, 297-98 (2d Cir. 2009) (defining scope of "clear error" review); Locurto v. Giuliani, 447 F.3d 159, 176 (2d Cir. 2006) (defining scope of deference for credibility judgments).

[4] Notwithstanding its assertions that Fly and the Firms do not compete, Fly interposed a counterclaim in this action for unfair competition.  The counterclaim was dismissed in the early stages of the litigation.

With respect to the fifth element, Fly argues that the evidence at trial was insufficient to show that Fly's activities posed a "substantial threat" to the Firms' incentives to continue their investment in the production of equity research reports.  In particular, Fly takes issue with the Firms' reliance on their own senior employees as fact witnesses and the absence of any expert or survey evidence at trial.[5]  But the testimony of the Firms' senior executives about the operation of their businesses was utterly credible in this respect.  The publication of the Recommendations by Fly and others within moments of their dissemination by the Firms has already caused the Firms to reduce substantially the resources devoted to equity research.  Id. at *8, *26-*27.  Neither survey nor expert evidence would have provided information as direct and as compelling concerning this impact as did the testimony from the Firms' senior executives.

B.   Irreparable Harm to the Defendants

The second factor is "whether the applicant will be irreparably injured absent a stay."  Nken, 129 S. Ct. at 1761. In the preliminary-injunction context, the Second Circuit has defined "irreparable harm" as an "injury that is neither remote nor speculative, but actual and imminent and that cannot be

_____

[5] Fly has never explained what kind of survey would have been helpful to a fact-finder in addressing this issue.

remedied by an award of monetary damages." <u>Forest City Daly</u>
<u>Hous., Inc. v. Town of N. Hempstead</u>, 175 F.3d 144, 153 (2d Cir.
1999); <u>see also</u> <u>Faiveley Transp. Malmo AB v. Wabtec Corp.</u>, 559
F.3d 110, 118 (2d Cir. 2009).  "As a general matter, because
monetary injury can be estimated and compensated, the likelihood
of such injury usually does not constitute irreparable harm."
<u>Brenntag Int'l Chem., Inc. v. Bank of India</u>, 175 F.3d 245, 249
(2d Cir. 1999); <u>see also</u> <u>Ford v. Reynolds</u>, 316 F.3d 351, 355 (2d
Cir. 2003) ("To establish irreparable harm, the injury alleged
'must be one requiring a remedy of more than mere money
damages.'" (citation omitted)).  To weigh in favor of a stay,
the applicant must demonstrate a probability of harm greater
than just "some possibility of irreparable injury."  <u>Nken</u>, 129
S. Ct. at 1761 (citation omitted).

    Fly's allegations of irreparable harm are without
sufficient factual support.  As evidence, Fly offers two emails,
sent March 19 and March 23, 2010, from subscribers wishing to
cancel their subscriptions to Fly.[6]  Fly's president, Ron

---

[6] The first email, sent March 19, 2010, stated:

> I just signed up a couple of days ago and was unaware
> of the court ruling which may or may not be reversed,
> which I disagree with by the way.  At this time, I am
> sorry but I need to cancel.

The second email, sent March 23, 2010, stated:

Etergino, asserts in an adjoining declaration that, based on these two emails, "[c]ancellations . . . are certain to become significant as time progresses, which will cause Defendant to encounter substantial adverse financial consequences." Such a prediction is not reliable in the absence of corroborative data, such as evidence of financial loss or a higher-than-usual rate of cancellations.[7] Fly is a service with many thousands of subscribers; the loss of two represents, at most, a $100 decline in monthly revenue.[8] Such a modest financial loss is not, without more, sufficient to permit a finding of irreparable harm.

Moreover, Fly's argument that it will suffer irreparable harm from the Injunction is in considerable tension with its assertion at trial that its business comprises much more than

---

[D]ue to the recent court ruling, the one where you guys will be restricted from showing research from Merril [sic], [B]arclays ect [sic] . . . . [I] will no longer be needing your services. [P]lease cancel as of the 1st of [A]pril 2010.

[7] The March 18 Opinion observed that "Etergino was not a reliable reporter of facts" at trial, that he "frequently contradicted himself" in his testimony, and that he showed a "lack of attention and care in making statements" about the nature of his business. March 18 Opinion, 2010 WL 1005160, at *13 n.25.

[8] Fly has approximately 3,300 direct subscribers to its website and another 2,000 subscribers who access its content through licensed financial content partners. Fly offers its ten categories of content in three packages, and charges its monthly subscribers either $25 for access to one package or $50 for access to all three packages. March 18 Opinion, 2010 WL 1005160, at *11.

just publishing headlines about the Firms' Recommendations.  The evidence at trial showed that, aside from reporting equity research recommendations, Fly also publishes headlines in nine other categories of content, including "Hot Stocks," "Rumors," "Conference/Events," "Syndicate," "Options," "General News," "Periodicals," "Technical Analysis," and "Earnings."  March 18 Opinion, 2010 WL 1005160, at *10.  The category at issue in this litigation, "Recommendations," includes research recommendations from sixty-five different investment firms, of which the Firms are only three.  Id.  Indeed, Etergino testified that only about 2.5 percent of Fly's overall output of headlines consists of the Firms' Recommendations.  Id. at *11.  That means that no less than 97.5 percent of Fly's reporting is wholly unaffected by the terms of the Injunction.

On its own initiative, moreover, the Court placed limitations on the Injunction to protect Fly from any unwarranted harm.  It expressly permits Fly to apply within one year from the issuance of the Injunction to modify or vacate it in the event that Fly can demonstrate that the Firms have not taken reasonable steps to restrain the systematic, unauthorized misappropriation of their Recommendations.[9]  Id. at *32.  When

---

[9] The Injunction also explicitly permits reporting on market movement that refers to one of the Firms' Recommendations insofar as Fly's reporting is in the context of independent analytical reporting on a significant market movement that has

the Court suggested this limitation toward the close of the
trial, Fly made no objection.  Indeed, unbeknownst to the Court,
Fly had already offered to settle with the Firms on essentially
the same terms.  In January 2008, Fly offered to accept an
"embargo" on its publication of "headline reports" concerning
the Firms' Recommendations, provided that such an embargo
included a "six month 'milestone' provision to condition the
embargo provisions on plaintiffs taking action against other
parties in the industry that also publish headlines concerning
plaintiffs' research reports."  Fly revealed to the Court the
existence of its 2008 offer in a March 26, 2010 filing.  This
offer so closely resembles the milestone provision ultimately
included in the Injunction that Fly's argument regarding
irreparable harm is severely undermined.[10]  Thus, the burden that
the Injunction places on the Firms to police the market if they
wish to stop Fly's infringement will reduce any competitive
disadvantage that Fly perceives it may suffer.[11]

---

already occurred that day.  March 18 Opinion, 2010 WL 1005160,
at *32.

[10] Of course, the Injunction provides for a twelve-month
"milestone" provision rather than the shorter, six-month one
offered during settlement negotiations.

[11] At trial there was evidence that the Firms had discussed their
concerns about the misappropriation of their Recommendations
with Fly's competitors, including major media outlets.  March 18
Opinion, 2010 WL 1005160, at *9.  In their opposition to Fly's

Finally, Fly argues that the Injunction curtails its "First Amendment rights" and, therefore, requires a per se finding of irreparable harm.[12]  To be sure, the Second Circuit has repeatedly held, in the context of ruling on interlocutory appeals from preliminary injunctions, that "[t]he loss of First Amendment freedoms, for even minimal periods of time, normally constitutes irreparable injury."  Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)); see also Kamerling v. Massanari, 295 F.3d 206, 214-15 (2d Cir. 2002).  In this case, however, the First Amendment argument cannot succeed in tipping the balance toward a stay.

It is important to note at the outset that, unlike in the context of a preliminary injunction, no restraint was placed on Fly's speech until after Fly was given a full and fair opportunity to present its defenses at trial.  As significantly, if Fly were truly concerned about potential encroachment upon

_____

motion, the Firms represent that they have continued those efforts since the Injunction was entered.

[12] In its principal brief, Fly discusses the First Amendment only in the context of irreparable harm.  In its reply brief, however, Fly indicates that it will attempt to assert a First Amendment challenge as part of its appeal of the merits. Arguments raised for the first time in a reply may not be considered when the opposing party is deprived of the opportunity to be heard as to that issue.  See, e.g., McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F.3d 92, 96 (2d Cir. 2009) (noting that a court "ordinarily will not consider issues raised for the first time in a reply brief"); Joseph v. Leavitt, 465 F.3d 87, 94 (2d Cir. 2006) ("Arguments may not be made for the first time in a reply brief." (citation omitted)).

its First Amendment rights and believed that the injunction that

the Firms sought would constitute "irreparable harm," it could

have made that argument at trial.  Instead, Fly expressly

disclaimed it.[13]

The Joint Pretrial Order in this case, submitted on

February 12, 2010 stated, in pertinent part:

> [T]he following affirmative defenses previously
> asserted by Defendant [Fly] are <u>not to be tried</u>:
> . . . .
> Defendant's publication of daily news from firms in
> the financial industry, including Plaintiffs, is
> constitutionally protected by the First Amendment to
> the U.S. Constitution.

(Emphasis in original.)  This unequivocal statement that Fly

would not raise a First Amendment defense was relied upon by the

parties in preparing for trial and by the Court in its pretrial

preparation, its evidentiary rulings, and its ultimate

determination of liability and supporting analysis in the March

---

[13] Fly asserts in its reply brief, falsely, that "Defendant
raised the First Amendment defense in its Answer, the Summary
Judgment motions, its defense of the hot-news misappropriation
claims in the Pre-Trial Order and at trial."  It is true that,
in its Answer, Fly asserted an affirmative defense that
"[d]efendant's publication of such daily news from firms in the
financial industry, including plaintiffs, is an acceptable and
necessary function in the life of the financial community that
is constitutionally protected by the <u>First Amendment</u>" (emphasis
in original).  Thereafter, however, Fly never again asserted a
First Amendment defense to the Firms' misappropriation claims.
To the extent that the First Amendment was implicated on summary
judgment, it was in the context of Fly's assertion of a fair use
defense to copyright infringement.  Fly did not again raise the
First Amendment as a defense to misappropriation until this stay
motion.

18 Opinion.  Indeed, when the March 18 Opinion revealed that no
First Amendment defense was considered, Fly did not move to
amend the judgment or seek a new trial addressed to that
defense.  Consequently, Fly may not now be heard, with an appeal
pending, that this Court failed to consider adequately a defense
that Fly had consciously and affirmatively abandoned.[14]
Similarly, because a supposed free speech defense was never
tried, it cannot be concluded -- as Fly does in its reply --
that "[a]ll factual issues on this defense were fully addressed
at trial" and, therefore, are ripe for appellate review.  Fly's
attempts to rewrite the history of this litigation are deeply
disingenuous.

    Even in the context of this stay motion, Fly has largely
waited until its reply brief to explain its First Amendment
defense, again depriving the Firms of any opportunity to

_____

[14] "The law in this Circuit is clear that where a party has
shifted his position on appeal and advances arguments available
but not pressed below, waiver will bar raising the issue on
appeal."  In re Nortel Networks Corp. Sec. Litig., 539 F.3d 129,
132 (2d Cir. 2008) (citation omitted) ("Nortel").  To be sure,
the Court of Appeals does "have discretion to consider waived
arguments in order to avoid a manifest injustice or where a
question of law is at issue and there is no need for additional
factfinding."  United States ex rel. Kirk v. Schindler Elevator
Corp., 601 F.3d 94, 2010 WL 1292143, at *13 n.10 (2d Cir. Apr.
6, 2010).  The Court of Appeals has made clear, however, that
"the circumstances normally do not militate in favor of an
exercise of discretion to address new arguments on appeal where
those arguments were available to the parties below and they
proffer no reason for their failure to raise the arguments
below."  Nortel, 539 F.3d at 133 (citation omitted).

14

respond.  Fly argues that "[t]he First Amendment protects the news media publication of lawfully obtained information of public significance," and Fly therefore suggests that the Supreme Court's holding in Int'l News Serv. v. Associated Press, 248 U.S. 215 (1918) ("INS"), may be inconsistent with the First Amendment.  Even then, however, its argument is sketchy and fails to engage with pertinent Second Circuit and Supreme Court authority.[15]  The Supreme Court has indicated that the Government's interest in "eliminating restraints on fair competition is always substantial, even when the individual or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment."  Turner

---

[15] Fly cites dicta from three Supreme Court cases: Eldred v. Ashcroft, 537 U.S. 186, 219 (2003), Bartnicki v. Vopper, 532 U.S. 514, 527-28, 533-35 (2000), and Smith v. Daily Mail Publ'g Co., 443 U.S. 97, 103-06 (1979).  Those cases do not support the proposition to which Fly seeks to apply them.  Eldred concerned the constitutionality of a federal statute that extended the term of protection for existing copyrighted works, while Bartnicki and Smith concerned the relationship under the First Amendment between the news media's interest in reporting about important public events and individuals' rights to privacy.
     Fly also relies upon dicta from NBA stating that if a work "is in the public domain, then its use would not be wrongful."  NBA, 105 F.3d at 845 (quoting Fin. Info., Inc. v. Moody's Investors Serv., Inc., 808 F.2d 204, 208 (2d Cir. 1986) ("FII")).  To the extent that Fly, citing FII, claims that it reports only information in the "public domain," Fly is arguing for a certain legal conclusion (i.e., for no liability) rather than making an observation that informs the questions at issue.  The phrase "public domain" does not carry the meaning that Fly supposes, namely, that an item is legally in the "public domain" if it has been made widely available.  If this were true, every copyrighted work sold in the marketplace would have entered the public domain and lost protection.

Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 664 (1994).  Indeed,
"the exchange of information about securities" is explicitly
cited by the Court as an example of the kinds of communications
that may be "regulated without offending the First Amendment."
Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad., 551 U.S.
291, 297 (2007) (citation omitted).  Other pertinent Supreme
Court authorities, several of which cite INS and rely upon its
fair-competition rationale, include Carpenter v. United States,
484 U.S. 19, 25-26 (1987), S.F. Arts & Athletics, Inc. v. U.S.
Olympic Comm., 483 U.S. 522, 541 (1987), Harper & Row
Publishers, Inc. v. Nation Enters., 471 U.S. 539, 556-59 (1985),
and Zacchini v. Scripps-Howard Broad. Co., 433 U.S. 562, 578
(1977).  Moreover, the Court of Appeals recently decided a case
involving a news organization's claim that it had a First
Amendment right to report on public matters even where such
conduct infringed applicable competition and intellectual
property laws.  Reversing and remanding the district court, the
Court of Appeals stressed that "the First Amendment does not
provide news entities an exemption from compliance with
intellectual property laws."  Sarl Louis Feraud Int'l v.
Viewfinder, Inc., 489 F.3d 474, 481 (2d Cir. 2007).  While the
aforementioned cases and principles may or may not apply here --
and this Court reaches no conclusion about whether they do,
given Fly's failure to raise a First Amendment defense at trial

-- it is instructive that Fly has not addressed them whatsoever in its application for a stay.

C.   Potential Harm to the Plaintiffs

The third factor requires an inquiry as to "whether issuance of the stay will substantially injure the other parties interested in the proceeding." Nken, 129 S. Ct. at 1761.  Fly asserts that the Firms will suffer no harm from a stay because Fly seeks only to "maintain[] the status quo that plaintiffs have acquiesced in for at least a decade."  Fly also continues to imply that it was unfairly singled out by the Firms as a subject of litigation.

Fly's arguments do not suffice to demonstrate that the Firms would not be substantially injured by a stay.  The evidence at trial showed that the Firms are prejudiced by the unauthorized and systematic publication of their Recommendations.[16]  That substantial harm was essentially one of the elements that the Firms had to prove at trial: the fifth NBA element is that "the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened." NBA, 105 F.3d at

---

[16] Because of this litigation, Fly began waiting for two or three other sources to publish the Firms' Recommendations before it would publish them, which still typically occurred before the market opening.  March 18 Opinion, 2010 WL 1005160, at *12-*13.

841.  The burden of proof now rests on Fly -- and <u>not</u> on the
Firms -- to prove that Fly's conduct does not cause "substantial
harm."  Fly has not met its burden of proving that its
incremental role in re-circulating, to its own subscriber
audience, the Firms' Recommendations would not cause further
substantial harm to the Firms.

Instead of squarely addressing this narrow question, Fly
seeks to shift the attention to other considerations.  For
example, Fly asserts, for the first time, that "[a]lthough
defendant was one of the early on-line financial services to
report Wall Street recommendations, it was by no means the first
in this field."  Fly did not provide evidence to that effect at
trial.  Rather, the proof at trial established that Fly was one
of the first to engage in the systematic misappropriation of the
Firms' Recommendations and one of the most ardent and successful
early practitioners of that misappropriation.  March 18 Opinion,
2010 WL 1005160, at *23.  Fly's core business in its early years
-- and the heart of its marketing campaign to this day -- is its
free-riding off the research done by the Firms and other
financial institutions.  <u>Id.</u> at *9, *22.  In any event, Fly has
not explained why these historical facts are relevant to a
consideration of whether the Firms will suffer "substantial
harm" going forward.  In sum, Fly has not proffered evidence
sufficient to enable the inference that the Firms would not

suffer substantial harm if the Injunction were vacated or modified pending appeal.

D.   Public Interest

The fourth and final factor requires a consideration of "where the public interest lies." Nken, 129 S. Ct. at 7161.  On this factor, Fly asserts that "issues of federal preemption are implicated by the injunction which extends to noncopyrightable aspects of plaintiffs' Recommendations."[17]

Fly's argument is entirely without merit.  The precise question addressed by the Second Circuit in NBA was whether a state-law claim for misappropriation of noncopyrightable material could survive preemption under the Copyright Act, and if so, to what extent.  The Second Circuit explicitly held that a narrow, five-element tort of "hot-news misappropriation" does survive such preemption.  That is the very tort that was litigated in this case, and Fly did not argue at trial that NBA was incorrectly decided.

As significantly, Fly conceded at trial that equity research in general, and by the Firms in particular, is a valuable social good.  March 18 Opinion, 2010 WL 1005160, at

---

[17] Fly cites an influential article by Judge Posner of the Seventh Circuit observing that there is "a deliberate federal policy to preserve a public domain consisting of the noncopyrightable contents (such as facts and ideas) of copyrightable works."  Richard A. Posner, Misappropriation: A Dirge, 40 Hous. L. Rev. 621, 631 (2003).

*28.  The Injunction was designed to preserve the incentive for the Firms to create equity research and to spread the benefits of that research to all investors while protecting legitimate news reporting.  Id. at *30.

### II.  Fly's Alternative Application for Modification of the Injunction

In the alternative, Fly requests that the Injunction be modified so that Fly may report on the Firms' Recommendations as soon as they have been published by a mainstream news service. Fly does not offer any additional argument or evidence in support of this alternative application.

Fly's alternative application cannot succeed.  First, Fly has not supplied any argument or evidence showing why the four-factor Nken test favors this application and has not explained what, if any, deficiencies in the Injunction would be addressed by the proposed modification.  Second, Fly's concerns about being faced with a potential competitive disadvantage by the ability of other services to continue publishing the Firms' Recommendations have already been addressed by the one-year milestone provision contained in the Injunction.  If the Firms do not demonstrate that they are enforcing their rights against other unauthorized re-publishers of their Recommendations, the Injunction may be modified or vacated at that time.

CONCLUSION

Fly's April 13, 2010 motion for a stay or modification of
the March 18, 2010 Injunction pending appeal is denied.

SO ORDERED:

Dated:    New York, New York
          May 7, 2010

                                    _____
                                          DENISE COTE
                                 United States District Judge